# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF KANSAS

| | | |
|---|---|---|
| AUDUBON OF KANSAS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.: |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF THE INTERIOR; DAVID | ) | |
| BERNHARDT, Secretary of United States | ) | |
| Department of the Interior; UNITED | ) | |
| STATES FISH AND WILDLIFE | ) | **COMPLAINT FOR DECLARATORY** |
| SERVICE; AURELIA SKIPWITH, | ) | **AND INJUNCTIVE RELIEF AND** |
| Director of United States Fish and | ) | **REQUEST FOR MANDAMUS** |
| Wildlife Service; MICHAEL BEAM, | ) | |
| Secretary of the Kansas Department of | ) | |
| Agriculture, and EARL B. LEWIS, | ) | |
| Chief Engineer of the Kansas | ) | |
| Department of Agriculture, Division of | ) | |
| Water Resources. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## INTRODUCTION

Audubon of Kansas brings this action on behalf of its membership against the U.S. Department of Interior, David Bernhardt in his official capacity as the Secretary of Interior, and other government entities and their agents—both federal and state—for violations of their statutory duties to protect the senior water right held by the U.S. Fish and Wildlife Service ("Service") and relied upon by the Quivira National Wildlife Refuge ("Refuge").

The Refuge lies in the transition zone where the arid eastern and western prairies meet. As a wetland of international importance, the Refuge provides sanctuary to a wide variety of waterfowl, shorebirds, and other wetland species, several of which are listed as threatened or

endangered pursuant to the federal Endangered Species Act. Since its establishment in 1955, the Refuge has grown to encompass 22,135 acres of land and wetlands—all dedicated to the purposes of conservation and protection of the numerous species of fish, plants, and wildlife inhabiting the area, especially the migratory waterfowl that rely on the Refuge's location upon the Central Flyway.  The Service has clear duties under federal law to protect the Refuge. To that end, the Service obtained a Kansas water right for the Refuge ("Refuge Water Right"), which holds a 1957 priority.

However, decades of excessive groundwater pumping by neighboring irrigators holding junior water rights have damaged and desiccated the Refuge, seriously harming its hydrological integrity and threatening its survival as a functioning groundwater-dependent ecosystem.  Since the 1980s, the Service has known about these harms and threats.  It first participated in halting efforts to address them through voluntary negotiations and agreements with local irrigation interests, but has consistently neglected its clear statutory duty to protect the Refuge and the Refuge Water Right. After three decades of such negotiated inaction, the Service at last acted to protect the Refuge Water Right when, in April of 2013, it filed an impairment complaint with the Kansas Department of Agriculture—Division of Water Resources ("KDA-DWR").

Acting pursuant to his non-discretionary duties, the chief engineer for KDA-DWR, David W. Barfield, P.E., and his staff timely conducted a thorough impairment investigation.  On July 15, 2016, chief engineer Barfield published the FINAL REPORT OF THE CHIEF ENGINEER CONCERNING A CLAIM OF WATER RIGHT IMPAIRMENT IN THE MATTER OF WATER RIGHT FILE NO. 7,571 OWNED AND OPERATED BY U.S. FISH AND WILDLIFE SERVICE ("Impairment Report"), attached as Exhibit 1 to this Complaint.  The Impairment Report made five principal findings: (1) the Refuge Water Right was indeed chronically and substantially impaired; (2) upstream and up-

gradient groundwater pumping by junior water right holders was the principal cause of that impairment; (3) as a consequence of such impairment, the Refuge had suffered from reduced water supplies for the last 34 years; (4) the Refuge and the Refuge Water Right would continue to suffer from shortages without the administration of junior water rights; and (5) because Kansas water law follows the prior appropriation doctrine, the Service was entitled to obtain the administration of all junior water rights which KDA-DWR had determined were impairing the Refuge Water Right.

How did the Service respond to this undisputed and unchallenged finding that the Refuge Water Right, and therefore the Refuge itself, was suffering from profound harm and neglect, in violation of federal law?  In two dramatically different ways.  At first, its professional field staff in Kansas filed requests to secure water to satisfy the Refuge Water Right—action consistent with Service custom and with the Service's 2013 decision to request an impairment investigation.  Yet under the leadership of Secretary Bernhardt and Director Skipwith, the Service then began to openly defy its clear statutory duty to protect the Refuge and the Refuge Water Right.

At the highest echelon of KDA-DWR, the Service found a willing accomplice to defy federal law.  Between 2016 and 2018, Dr. Jackie McClaskey, Ph.D., secretary of KDA, issued repeated written statements that KDA-DWR would not protect the Refuge Water Right. She would not allow the administration, or curtailment, of the junior water rights that were impairing the Refuge Water Right. Dr. McClaskey issued these defiant statements despite Service requests to protect the Refuge Water Right, despite the Impairment Report's clear finding that the Refuge Water Right was seriously impaired, and despite the fact that she lacked any statutory authority over the administration of Kansas water rights.  Mr. Barfield, who as chief engineer held the

office that does hold exclusive jurisdiction over the administration of all Kansas water rights, submitted to Dr. McClaskey's decision not to protect the Refuge Water Right. He submitted to Dr. McClaskey's *ultra vires* directives and her forceful appeasement of politically powerful irrigation interests. Unfortunately, he thereby violated the laws he was entrusted with enforcing.

By late 2019 however, after the departure of Dr. McClaskey, KDA-DWR was at last prepared to protect the Refuge. The agency designed and distributed a comprehensive plan to administer all of the junior rights whose pumping was impairing the Refuge Water Right, according to the findings of the Impairment Report. Recognizing that KDA-DWR was finally going to fulfill its non-discretionary duties, junior irrigators and Big Bend Groundwater Management District No. 5 ("GMD5") contacted various politicians, most prominently members of Kansas's congressional delegation, Senator Jerry Moran and Congressman (now Senator) Roger Marshall. Together, they negotiated with secretary of agriculture Mike Beam (Dr. McClaskey's successor), the Service, and GMD5. These negotiations yielded a void and illegal bargain between the Service and GMD5, in which the Service agreed to withdraw its request to secure water. The Refuge Water Right would thus remain unprotected—in open and knowing violation of federal law.

As a consequence of this deliberate dereliction of duty by federal and state officials, the Refuge has been starved of groundwater and surface water supplies—even when Kansas was suffering from an official drought emergency in 2018. The defendants have blatantly violated numerous procedural, substantive, and—most importantly—*non-discretionary* statutory duties that command the protection of the Refuge and the Refuge Water Right. In willfully failing to secure and to protect the Refuge Water Right, the defendants have demonstrated deliberate intent to ignore the statutes that protect the Refuge. Because they cannot be expected to protect the

Refuge and the threatened and endangered species that depend upon it, it now falls upon this Court to ensure that the Refuge has sufficient water supplies. This Court must therefore make these legal protections clear by declaration, enjoin the defendants from further violating federal law according to these declarations, and order the defendants to protect the Refuge and the Refuge Water Right according to the law's clear mandates.

## JURISDICTION AND VENUE

1.       This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C.A. § 2201 (declaratory judgment), 28 U.S.C.A. § 2202 (injunctive relief), and 28 U.S.C.A. § 1361 (mandamus relief). The challenged agency inaction is subject to this Court's review under the Administrative Procedure Act ("APA"), 5 U.S.C.A. § 706.

2.       Venue in this Court is proper under 28 U.S.C.A. § 1391(e), because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and a substantial part of the land at issue is within this judicial district. Plaintiff resides in and maintains its primary place of business in this judicial district.

## PARTIES AND STANDING

### Plaintiff

3.       Plaintiff AUDUBON OF KANSAS ("AOK") is an independent grassroots nonprofit organization with approximately 5,000 members.  AOK was founded in 1999 to promote the enjoyment, understanding, protection, and restoration of the state's natural ecosystems with a focus on birds, other wildlife, and their habitats.  The members of AOK are being and will be adversely affected by Defendants' actions or failures to act complained of herein.  AOK is a not for profit corporation authorized and existing under the laws of the state of Kansas.  It was actually founded in 1976 with a name change in 1999.

4.      AOK engages in conservation work to protect and advocate for birds and other wildlife throughout Kansas, Nebraska, and the central Great Plains, and both its members and Board of Trustees come from numerous states across the region.  AOK owns and maintains nature sanctuaries to protect birds, habitats, and ecosystems, and organizes birding and natural history activities.  Restoring and protecting the health of the Refuge is of paramount importance to migratory waterfowl along the Central Flyway.  AOK staff provides education and information to its members and the public through action alerts, press releases, fact sheets, reposting of letters to lawmakers, and information distributed by Service staff relating to the Refuge.

5.      AOK's primary concern in this case is the protection of the Refuge. AOK has members that regularly visit, use, or enjoy the Refuge for bird watching and other recreational, aesthetic, scientific, educational and spiritual purposes, and AOK's members will continue to do so on a regular basis indefinitely.  The impairment of the Refuge Water Right poses an ongoing threat to the Refuge and the birds that depend on it, and therefore, to the interests of AOK members. Defendants' failure to comply with legal obligations under federal law ensuring the Refuge has an adequate supply of water to carry out the conservation mission of the Refuge and the National Wildlife Refuge System injures AOK's members' use and enjoyment of the Refuge.

6.      Plaintiff AOK has standing to bring this action on behalf of its members. Members of Plaintiff AOK live near and enjoy the use of the Refuge affected by Defendants' actions or failure to act complained of herein, and they will continue to visit and enjoy the resources of the Refuge at regular times indefinitely.  The above-described property, educational, scientific, aesthetic, conservation, and recreational interests of the Plaintiff and

its members have been and will continue to be adversely affected and irreparably injured by Defendants' failure to acquire, protect, and maintain adequate water supplies for the Refuge and to fulfill the conservation mission of the National Wildlife Refuge System.

7.      The defendants have recognized the participation of AOK in the controversy surrounding the Refuge Water Right and have participated with AOK in public and private meetings and in correspondence regarding the Refuge.

**<u>Defendants</u>**

8.      Defendant DAVID BERNHARDT is the Secretary of the United States Department of the Interior ("Secretary"). The Secretary is the official ultimately responsible under federal law for the management and protection of the Refuge. The Secretary is sued in his official capacity.

9.      Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is an agency of the United States within the meaning of the Administrative Procedure Act, 5 U.S.C.A. § 1331 *et seq.*

10.     Defendant AURELIA SKIPWITH is the Director ("Director") of the Service, an agency housed within the Department of the Interior. She is legally responsible for overseeing the Service's activities, including the protection of the Refuge. The Director is sued in her official capacity.

11.     Defendant UNITED STATES FISH AND WILDLIFE SERVICE is the federal agency responsible for the management, operation, and protection of the Refuge in accordance with federal law. The Service's mission is to conserve, protect, and enhance fish, wildlife, plants, and their habitats for the continuing benefit of the American people.  Defendant United States

Fish and Wildlife Service is an agency of the United States within the meaning of the Administrative Procedure Act, 5 U.S.C.A. § 500 *et. seq*.

12.     Defendant MICHAEL BEAM is the Secretary of the Kansas Department of Agriculture ("KDA").  He is legally responsible for overseeing the KDA, an agency that includes the Kansas Division of Water Resources ("KDA-DWR").  He is therefore responsible for KDA-DWR's role in failing to protect the Refuge Water Right. Secretary Beam is sued in his official capacity.

13.     Defendant EARL B. LEWIS, P.E., is the chief engineer of KDA-DWR.  He succeeded Mr. Barfield as chief engineer in November, 2020. Under the Kansas Water Appropriation Act ("KWAA"), K.S.A. § 82a-701 *et seq.,* the chief engineer has jurisdiction over all of the waters of Kansas and the administration of Kansas water rights, according to the doctrine of prior appropriation.  Chief engineer Lewis is sued in his official capacity.

14.     Defendant KANSAS DEPARTMENT OF AGRICULTURE, DIVISION OF WATER RESOURCES is an agency of the State of Kansas charged with administration of State statutes and regulations governing the waters of Kansas and the beneficial use of water made according to water rights. It is the only water rights agency in the United States that is subordinate to a department of agriculture.

### STATUTORY AND LEGAL BACKGROUND

**The National Wildlife Refuge System and Improvement Act of 1997**

15.     The Federal National Wildlife Refuge System Improvement Act of 1997 ("NWRSIA") is the organic statute and legal foundation of the nation's federal wildlife refuges. 16 U.S.C.A. § 668dd.

16.     The mission of NWRSIA is "to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the Unites States for the benefit of present and future generations of Americans."  16 U.S.C.A. § 668dd(a)(2).

17.     NWRSIA further states that "it is the policy of the United States that . . . each refuge shall be managed to fulfill the mission of the System, as well as the specific purposes for which that refuge was established."  16 U.S.C.A. § 668dd(a)(3)(A).

18.     To ensure the fulfillment its mission and policies, Congress included a list of substantive management criteria within NWRSIA that establish non-discretionary duties on the part of the Secretary and officials of the Service to whom the Secretary delegates authority.  16 U.S.C.A. § 668dd(a)(4).

19.     NWSRIA mandates that, "[i]n administering the System, the Secretary shall—

(A) provide for the conservation of fish, wildlife, and plants, and their habitats within the system;

(B) ensure that the biological integrity, diversity, and environmental health of the System are maintained for the benefit of present and future generations of Americans;

. . .

(D) ensure that the mission of the System . . . and the purposes of each refuge are carried out, except that if a conflict exists between the purposes of a refuge and the mission of the System, the conflict shall be resolved in a manner that first protects the interests of the refuge, and, to the extent practicable, that also achieves the mission of the System;

(E) ensure effective coordination, interaction, and cooperation with owners of land adjoining refuges and the fish and wildlife agency of the States in which the units of the System are located;

(F) assist in the maintenance of adequate water quantity and quality to fulfill the mission of the System and the purposes of each refuge;

(G) acquire, under State law, water rights that are needed for refuge purposes;

. . .

(M) ensure timely and effective cooperation and collaboration with Federal agencies and State fish and wildlife agencies during the course of acquiring and managing refuges; and

(N) monitor the status and trends of fish, wildlife, and plants in each refuge.  *Id.*

20.     The Service considers "biological diversity" as "the biotic composition, structure, and functioning at the genetic, organism, and community levels comparable with historic conditions, including the natural biological processes that shape genomes, organisms, and communities."  66 Fed. Reg. 3,818 (Jan. 16, 2001); U.S. FWS Division of Natural Resources, *U.S. Fish and Wildlife Manual*, 601 FW 3, § 3.6(A) (2001) (as amended July 31, 2006) ("Service Manual").

21.     The Service defines "biological integrity" as "[b]iotic composition, structure, and functioning at genetic, organism, and community levels comparable with historic conditions, including the natural processes that shape the environment."  66 Fed. Reg. 3,818 (Jan. 16, 2001); Service Manual at § 3.6(B).

22.     The Service defines "environmental health" as "[c]omposition, structure, and functioning of soil, water, air, and other abiotic features comparable with historic conditions, including the natural abiotic processes that shape the environment."  66 Fed. Reg. 3,818 (Jan. 16, 2001); Service Manual at § 3.6(C).

23.     The Service defines the "historic conditions" benchmark within these above definitions to mean "[c]omposition, structure, and functioning of ecosystems resulting from natural processes that [the Service] believe[s], based on sound professional judgment, were

present prior to substantial human related changes to the landscape." 66 Fed. Reg. 3,818 (Jan. 16, 2001); Service Manual at § 3.6(D).

24.     In addition to the above listed statutory duties, the Secretary is required by the NWRSIA to issue a "comprehensive conservation plan ("CCP") for each refuge" every 15 years, and "shall manage each refuge . . . in a manner consistent with the plan." 16 U.S.C.A. § 668dd(e)(1).

25.     A CCP for the Refuge was finalized and published in October 2013. It articulates the Service's goals for the management of the Refuge, including:

   a.   To "[a]ctively protect, preserve, manage, and restore the functionality of the diverse ecosystems of the Rattlesnake Creek watershed.";

   b.   To "[a]ctively conserve and improve environmental conditions within refuge boundaries to promote sustainable, native ecological communities and support species of concern associated with this region of the Great Plains."; and

   c.   To "effectively raise and use money to support the long-term integrity of the infrastructure, habitats, and wildlife resources at the [R]efuge . . . ."

U.S. Fish and Wildlife Service, *Comprehensive Conservation Plan: Quivira National Wildlife Refuge*, 16–17 (Oct. 2013) ("Quivira CCP", attached as Exhibit 2 to this Complaint).

26.     The Quivira CCP expressly notes that "water rights have been overappropriated within the [ground]water management district," [GMD5], and that the current water resource and land use trends in the area are a cause for concern in assuring both future water availability and quality. Quivira CCP at 18.

27.     It is further stated within the Quivira CCP that "adequate water quantity and chemistry are critical factors of refuge saltmarsh and wetland communities," and that "[s]ubstantial declines in the water table would also likely affect grassland and meadow habitats." *Id.* at 18–19.

28.     The Quivira CCP notes the seniority of the Refuge Water Right and provides

that—as part of its strategies in ensuring the refuge's water need are met in the future— the

Service will "[c]ollaborate with agencies responsible for regulating water use in the Rattlesnake

Creek watershed to help identify and improve water use efficiencies."  *Id.*

29.     Additionally, federal regulation dictates that "[n]o person shall take any animal or

plant on any national wildlife refuge," which includes "[d]isturbing, injuring, spearing,

poisoning, destroying, collecting or attempting to disturb, injure, spear, poison, destroy or collect

any plant or animal on any national wildlife refuge."  50 C.F.R. §§ 27.21, 27.51.

**The Endangered Species Act**

30.     Congress declared within the Endangered Species Act of 1973 ("ESA") that many

species of fish, wildlife, and plants, which "are of esthetic, ecological educational, historical,

recreational, and scientific value to the Nation and its people" have "been so depleted in numbers

that they are in danger of or threatened with extinction," and therefore, the declared purpose of

the ESA is to "provide a means whereby the ecosystems upon which endangered species and

threatened species depend may be preserved."  16 U.S.C.A. § 1531.

31.     The term "endangered species" is defined by the ESA to mean any species which

is in danger of extinction.  16 U.S.C.A. § 1532(6).

32.     The term "threatened species" is defined by the ESA to mean "any species which

is likely to become an endangered species within the foreseeable future."  16 U.S.C.A. §

1532(20).

33.     With respect to any endangered species, the ESA declares it unlawful to "take any

such species within the United States or the territorial sea of the United States."  16 U.S.C.A. §

1538(a)(1)(B).

34.     The term "take" under the ESA is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C.A. § 1532(19).

35.     The term "harass" is further defined by the regulations to mean "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering."  50 C.F.R. § 17.3(c).

36.     The term "harm" is defined by the regulations to mean "an act which actually kills or injures wildlife.  Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."  *Id.*

37.     The meaning of the statutory and regulatory definitions of "harass" and "harm" include any intentional or negligent act or omission which modifies wildlife habitat in such a way as to create the likelihood of injury to wildlife. *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 704 (1995).

38.     The ESA mandates that all Federal agencies must make sure "that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species . . . ." 16 U.S.C.A. § 1536(a)(2).

39.     The ESA expressly allows for citizen suits, stating that "any person may commence a civil suit on his own behalf—"

> (A) to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof; or

13

> (B) to compel the Secretary to apply . . . the prohibitions set forth in or authorized pursuant to section 1533(d) or 1538(a)(1)(B) of [the ESA] with respect to the taking of any resident endangered species or threatened species within any State; or
>
> (C) against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of [the ESA] which is not discretionary with the Secretary.

16 U.S.C.A. § 1540(g).

40.     The ESA citizen suit provision states that "[t]he district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce any such provision or regulation, or to order the Secretary to perform such act or duty, as the case may be.  In any suit commenced under subparagraph (B) the district court shall compel the Secretary to apply the prohibition sought if the court finds that the allegation that an emergency exists is supported by substantial evidence."  *Id.*

**National Environmental Policy Act**

41.     Under the National Environmental Policy Act (NEPA), Congress declared it to be "the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans."  42 U.S.C.A. § 4331(a).

42.     To carry out this policy, Congress established that "it is the continuing responsibility of the Federal Government to use all practical means, consistent with other

essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—"

1. fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

2. assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

3. attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

4. preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice; [and]

5. achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities.

*Id.* at § 4331(b).

43. Pursuant to NEPA, whenever taking a major Federal action significantly affecting the quality of the human environment, all Federal agencies must create a detailed statement that states:

(i) the environmental impact of the proposed action;

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented;

(iii) alternatives to the proposed action;

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C.A. § 4332(C).

44.     Additionally, such agencies must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources" under NEPA.  *Id.* at § 4332(E).

45.     These procedural requirements are in place to ensure that each agency decision maker considers all possible approaches to a particular project that could alter the environmental impact and cost-benefit balance, and this is to ensure that the most intelligent, optimally beneficial decisions will be made.  *See Concerned about Trident v. Schlesinger*, 400 F.Supp. 454, 489 (D.D.C. 1975).

46.     Furthermore, compelling a formal detailed statement and a description of alternatives provides evidence that the mandated decision-making process has in fact taken place and, most importantly, allows those removed from the initial process to evaluate and balance the factors on their own.  *See Schlesinger*, 400 F.Supp. at 489.

47.     Even where an agency has decided that a NEPA statement is not yet necessary, it should state the reasons for its decision.  *See Scientists' Institute for Public Information v. Atomic Energy Commission*, 481 F.2d 1079, 1094 (D.C. Cir. 1973).

48.     Essentially, NEPA requires all agencies to give environmental issues a "hard look" before making decisions.  *See Schlesinger*, 400 F.Supp. at 489.

**<u>Administrative Procedure Act</u>**

49.     Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C.A. § 702.

50.     Judicial review is available under the APA where such review is either expressly granted by statute or where an agency action constitutes a "final agency action for which there is no other adequate remedy."  5 U.S.C.A. § 704.

51.     "Agency action" under the APA includes an agency's failure to act. 5 U.S.C.A. § 551.

52.     Under the APA, the reviewing court may "compel agency action unlawfully withheld or unreasonably delayed," as well as hold unlawful and set aside agency action it finds to be:

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law; [or]
>
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of [the APA] or otherwise reviewed on the record of an agency hearing provided by statute.

5 U.S.C.A. § 706.

**Federal Reserved Water Rights Doctrine**

53.     The Supreme Court of the United States has recognized the federal reserved water rights doctrine since 1908, in *Winters v. United States,* 207 U.S. 564 (1908). The doctrine acknowledges the implied federal rights of the United States when it dedicates public land for a federal purpose: in such a case, "the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation.  In so doing the United States acquires a reserved right in unappropriated water which vests on the date

of the reservation and is superior to the rights of future appropriators." *Cappaert v. United States*, 426 U.S. 128, 142–43 (1976).

54.     In making the determination over whether there exists a federal reserved water right appurtenant to federal land, courts will infer the intent to reserve water rights if they are necessary to accomplish the purposes for which the reservation was created. *Id.*

**The Kansas Water Appropriation Act**

55.     By enacting the 1945 Kansas Water Appropriation Act (KWAA), K.S.A. § 82a-701 *et seq.*, Kansas conferred exclusive jurisdiction over all of the water resources of the state, both surface and groundwater resources, upon the chief engineer of KDA-DWR. K.S.A. §§ 82a-702, 82a-706, 82a-707(a).

56.     The KWAA codified the prior appropriation doctrine for all of the waters of Kansas. The KWAA charges the chief engineer and no one else with the nondiscretionary duty to "enforce and administer the laws of [Kansas] pertaining to beneficial use of water and shall control, conserve, regulate, allot and aid in the distribution of the water resources of the state for the benefits and beneficial uses of all [Kansas] inhabitants in accordance with the rights of priority of appropriation." K.S.A. § 82a-706.

57.     A "water right" under the KWAA is defined as "any vested right or appropriation right under which a person may lawfully divert water," and furthermore, that "[i]t is a real property right appurtenant to and severable from the land on or in connection with which the water is used." K.S.A. § 82a-701(g).

58.     Under Kansas's codified prior appropriation doctrine, "the date of priority of every water right of every kind, and not the purpose of use, determines the right to divert and use water at any time when the supply is not sufficient to satisfy all water rights." K.S.A. § 82a-

707(b). Between holders with appropriation rights, "the first in time is the first in right." K.S.A. § 82a-707(c).

59.     The KWAA charges the chief engineer or his authorized agents, and no one else, with the specific and non-discretionary duty to administer water rights according to priority:

> "(a) It shall be unlawful for any person to prevent . . . any waters of this state from moving to a person having a prior right to use the same . . . . Upon making a determination of an unlawful diversion, the chief engineer or the chief engineer's authorized agents, shall, as may be necessary to secure water to the person having the prior right to its use . . . :

> (1) Direct that the headgates, valves, or other controlling works of any ditch, canal, conduit, pipe, well or structure be opened, closed, adjusted or regulated . . . ."

K.S.A. § 82a-706b(a). The statutory language of this section is clear. It is unlawful to interfere with the beneficial use of water made pursuant to prior rights by preventing such water from reaching the prior right's point of diversion. Upon determining that such interference has occurred—in this case by determining that the Refuge Water Right, a prior right, has been impaired—the chief engineer "shall" shut down junior rights to remedy that impairment. *Id.* As set forth in detail in the Impairment Report, the pumping of junior groundwater rights in the hydrological vicinity of the Refuge Water Right has, for over three decades, prevented surface and groundwater—the waters of this state—from moving to the senior Refuge Water Right's point of diversion in quantities necessary to satisfy its authorized annual quantities.

60.     Where KDA-DWR has found senior water rights to be impaired by the pumping of junior water rights, both temporary and permanent injunctive relief, in the form of shutting down all wells impairing the senior right, is appropriate.  K.S.A. §§ 82a-716, -717a; *Garetson Brothers. v. American Warrior, Inc.*, 51 Kan.App.2d 370, 347 P.3d 687 (2015); *Garetson Brothers v. American Warrior, Inc.*, 56 Kan.App.2d 623, 435 P.3d 1153 (2019). To "impair" means to diminish, weaken, or injure the prior right. *Garetson,* 51 Kan.App.2d at 389. The

impairment of a senior water right, year after year, constitutes irreparable harm under Kansas law. *Id*. at 379.

61.    Rattlesnake Creek, the source of supply for the Refuge Water Right, is entitled to minimum desirable streamflows, subject to subsequent assessment of the "lagged effects of extensive groundwater appropriations in [the] regional aquifer."  K.S.A. § 82a-703c(b).

62.    The KWAA requires the chief engineer to adopt and to enforce regulations necessary for the purposes of the KWAA. K.S.A. § 82a-706a.

63.    Section 706b of the KWAA was amended in 2015 to allow the chief engineer to, "within the rattlesnake creek subbasin located in hydrologic unit code 11030009, allow augmentation for the replacement in time, location and quantity of the unlawful diversion, if such replacement is available and offered voluntarily."  K.S.A. § 82a-706b(a)(2).

64.    The chief engineer has never adopted regulations defining or explaining what "augmentation" in particular and K.S.A. § 82a-706b(a)(2) in general mean.

65.    Whenever any court has declared or adjudicated water rights, the chief engineer shall enforce the court's decree. K.S.A. § 82a-719.

66.    Any person who violates the KWAA may incur a civil penalty. K.S.A. § 82a-737(b)(3).

67.    While the secretary of agriculture may review certain orders of the chief engineer pursuant to the Kansas Administrative Procedure Act, the chief engineer's decisions in administering junior water rights to remedy the impairment of senior water rights are not subject to review by the secretary.  K.S.A. § 82a-1901(c).  They never have been.

**Kansas Groundwater Management District Act**

68.     Under the Kansas Groundwater Management District Act ("GMDA"), local groundwater management districts ("GMDs") enjoy substantial powers, including the power to recommend rules and regulations to the chief engineer; but such rules and regulations have no effect unless the chief engineer adopts them pursuant to the KWAA. K.S.A. § 82a-1028(o).

69.     Under the GMDA, GMD's may take the initiative to reduce groundwater pumping by recommending to the chief engineer the start of proceedings for the designation of an intensive groundwater use control area ("IGUCA") within the district, K.S.A. § 82a-1028(u), but GMD5 has made no such recommendation.

70.     Under the GMDA, the chief engineer may, on his own initiative, begin proceedings for the designation of an IGUCA, K.S.A. § 82a-1036, but the chief engineer has not done so for the area surrounding the Refuge.

71.     Under the GMDA, GMDs may also take the initiative to reduce groundwater pumping by recommending to the chief engineer the start of proceedings for the designation of a local enhanced management area ("LEMA") within the GMD, K.S.A. § 82a-1041(a), but the chief engineer has yet to accept a LEMA management plan for the Refuge.

72.     Regardless of what GMD5 has done or not done, nothing in the GMDA limits or affects "any duty or power" of the chief engineer granted pursuant to the KWAA. K.S.A. § 82a-1039.

## THE QUIVIRA NATIONAL WILDLIFE REFUGE

**Historical Background**

73.     The Migratory Bird Conservation Commission approved the establishment of the "Great Salt Marsh National Wildlife Refuge" in May, 1955.  In 1958, the name of the refuge was changed to the Quivira National Wildlife Refuge.

74.     The Refuge was established pursuant to the following authorities and for the following purposes: (a) the Migratory Bird Conservation Act, 16 U.S.C. § 715d, for use "as an inviolate sanctuary" for migratory birds; and (b) the Fish and Wildlife Act of 1956, 16 U.S.C. § 742f, for "the development, advancement, management, conservation, and protection of fish and wildlife resources".  Quivira CCP at 14.

75.     The Refuge, located west of the 98th Meridian, contains approximately 22,135 acres in Stafford, Reno and Rice Counties, approximately 7,000 acres of which are groundwater-dependent wetland ecosystems. Quivira CCP at 14.

76.     By 1969, the Service had acquired 21,820 acres for the Refuge by purchase from willing sellers.  Subsequent acquisitions and purchases enlarged the Refuge to its present size of 22,135 acres.  The Service paid $2,059,238 for these lands.  Quivira CCP at 14.

**The Wildlife and Ecology of the Refuge**

77.     The Refuge attracts and protects hundreds of thousands of ducks and geese of thirty different species, shorebirds, wading birds (including tens of thousands of Sandhill Cranes and one of the only surviving flocks of Whooping Cranes) and water birds annually.

78.     The Refuge's location in the middle of the Central Flyway of the United States places it in the primary pathway for many species of migrating birds; over 340 species of birds have been recorded at the Refuge.

79.     The habitat of the Refuge is a unique combination of rare inland salt marsh and sand prairie.  It is an extremely rare, isolated, and valuable groundwater-dependent ecosystem.

80.     The Refuge is one of only thirty Wetlands of International Importance as defined by the Ramsar Convention for the Conservation and Sustainable Use of Wetlands, an international treaty signed in 1971, to which the United States is a signatory party.

81.     In 1994, the Refuge was also designated as part of the Western Hemisphere Shorebird Reserve Network.  The designation is based upon the Refuge's supporting more than 500,000 shorebirds annually during their vast, nearly pole-to-pole migrations.

82.     In 2001, the American Bird Conservancy designated the Refuge as a Globally Important Bird Area.

83.     The Whooping Crane (*Grus americana*) is listed as an endangered species under the ESA.  16 U.S.C.A. § 1533; 32 Fed. Reg. 4001.  The tallest North American bird and one of the rarest, Whooping Cranes once numbered as few as sixteen. Whooping Cranes depend upon the Refuge during their annual migrations along the Central Flyway.  They stay regularly at the Refuge during their Spring (March-April) and Fall (October-November) migrations.

84.     Whooping Cranes depend upon the saline-freshwater mix of the Refuge's wetlands, the shallow depths of the wetlands, and the Refuge's littoral, marsh, and riparian areas for feeding and roosting.

85.     The Refuge provides habitat for the Interior Least Tern (*Sternula antillarum*), which is listed as an endangered species under the ESA.  50 Fed. Reg. 21784.

86.     The Refuge hosts a nesting population of Interior Least Terns in both the Big and Little Salt Marsh areas of the Refuge. Interior Least Terns rely upon the Refuge's habitat during the spring, summer, and early fall (March-September).

87.     The Refuge provides habitat for the Snowy Plover (*Charadrius nivosus*), which is listed as a threatened species under the ESA.  56 Fed. Reg. 58804.

88.     A population of Snowy Plovers regularly nests on sand flats within the Refuge, primarily in the Big Salt Marsh area.  Snowy Plovers rely upon the Refuge's habitat from spring through early fall (March-September).

89.     The Piping Plover (*Charadrius melodus*), a small shorebird similar to the Snowy Plover, occurs at the Refuge during migration. It is recognized as a "species of concern." Species of concern are those species of plants and animals that, while not falling under the definition of special status species, are of management interest by virtue of being Federal trust species such as migratory birds, important game species, significant keystone species, species that have documented or apparent populations declines, small or restricted populations, or dependence on restricted or vulnerable habitats. *See* Quivira CCP at 117.

90.     Many other recognized "species of concern" depend upon the Refuge. Species with that status that reside at the Refuge include but are not limited to: Black Rail (*Laterallus jamaicensis),* Black Tern (*Chlidonius niger*), Eastern Hognose Snake, Western Hognose Snake, Ferruginous Hawk (*Buteo regalis),* Golden Eagle (*Aquila chrysaetos),* Long-billed Curlew (*Numenius americanus),* Short-eared Owl (*Asio flammeus*), and Southern Bog Lemming.

91.     Hundreds of thousands of migratory shorebirds of at least thirty different species rely upon the Refuge and its water-dependent habitat to feed on shorelines, mud flats, and in shallow water.  These shorebirds include but are not limited to: plovers, sandpipers, phalaropes, yellowlegs, and snipe.

92.     The Refuge attracts migrating shorebirds during the spring and fall migrations. Beginning as early as February of each year, Greater and Lesser Yellowlegs, along with other

species of sandpipers, begin to appear at the Refuge during their northward migration. The number of varied species and birds increase until reaching a peak in May, when shorebirds can be found wherever surface water is available at the Refuge. The Fall, southward migration begins in early July, typically peaking in late August and September.

93.     Shorebirds do not reside at the Refuge merely as migratory species. Several species use the Refuge as nesting habitat. These extant breeding populations survive often hundreds of miles distant from the next nearest breeding population of the same species. Nesting species include but are not limited to: Wilson's Phalarope (*Phalaropus tricolor*), Snowy Plover (*Charadrius nivosus*), American Avocet (*Recurvirostra Americana*), and Black-necked Stilt (*Himantopus mexicanus*).

94.     A critical hydrological feature of the Refuge is its inland salt marsh. Inland salt marshes are rare in the United States. The Refuge's wetlands are unique in the Central Flyway due to the high concentrations of naturally-occurring salt deposits at the Refuge. These deposits are near enough to the land surface of the Refuge to affect groundwater that percolates and migrates to the Refuge's surface water supplies.

95.     As a consequence of the Refuge's salt deposits, the Refuge enjoys a sufficiently high salinity to support plant species such as inland salt grass (*Distichis spicata*), alkali sacaton (*Sporobolus airoides*), and seepweed (*Suaeda caceoliformis*). These plant species form an important component of the Refuge's native ecology.

**The Refuge Water Right**

96.     The Service holds the Refuge Water Right, File No. 7,571, pursuant to the KWAA. The Refuge Water Right is a permanent, real property right with the following attributes:

a.     A priority of August 15, 1957;

b.     An authorized quantity of 14,632 acre-feet of annual diversion and use;

c.     A maximum diversion rate of 300 cubic feet per second ("cfs");

d.     Three points of diversion from Rattlesnake Creek, a surface water tributary of the Little Arkansas River, which is a tributary of the Arkansas River;

e.     Places of use consisting of wetlands, the Little Salt Marsh, and Refuge management areas, all of which are located within the confines of the Refuge; and

f.     The beneficial use of recreational use. *See* Certification of Appropriation for Beneficial Use of Water, Water Right File No. 7,571 (April 9, 1996), included as Exhibit 4 to the Impairment Report, at pp. 73-74.

97.     Based on Kansas law and KDA-DWR's own statements, the Service may hold an additional state law water right or water rights appurtenant to the Refuge with the following attributes:

a.     A priority date or priority dates prior to August 15, 1957, including vested rights appurtenant to the Refuge that date prior to 1945; and

b.     Quantities of authorized diversion and beneficial use in addition to those described in the Refuge Water Right Certificate of Appropriation. *See* Impairment Report, at 17.

98.     Based on Kansas law and KDA-DWR's own statements, the Refuge Water Right is entitled to divert an annual authorized quantity of 22,200 acre-feet from Rattlesnake Creek, based on its claims to necessary water usage in 1957.  *See* Impairment Report, at 17-18.

**The Impairment of the Refuge Water Right, 1970s-2016**

99.     The Refuge is located at the lowermost extent of the Rattlesnake Creek sub-basin, just upstream of its confluence with the Arkansas River in Rice County.

100.    Rattlesnake Creek can be considered primarily as the drain, or overflow spillway, from the hydrologically connected aquifer beneath it. Because of this groundwater supply, Rattlesnake Creek has, until fifty or so years ago, been a perennial stream from a point several miles upstream from St. John, Kansas, to where it turns north near the Little Salt Marsh on the Refuge. The flow of Rattlesnake Creek is very dependent upon hydrologically-connected groundwater supplies.

101.    Defined as conditions before the onset of "significant, human-caused change," 16 Fed. Reg. 3,811 (Jan. 16, 2001), the "historic conditions" of the Refuge and its surrounding area were those of the native Great Bend Prairie, including abundant surface and groundwater supplies undepleted by the activities of man, sand prairie, salt marshes, and surface- and groundwater-dependent ecosystems.  Quivira CCP at 13–16.

102.    According to KDA-DWR's and GMD5's own estimates, flows in Rattlesnake Creek at the Macksville gage ranged between 20 and 84 cfs during the historical period between 1940 and 1980.

103.    According to KDA-DWR's and GMD5's own estimates, flows in Rattlesnake Creek at the Zenith gage ranged between 24 and 172 cfs during the historical period between 1940 and 1980.

104.    According to KDA-DWR's and GM5's own estimates, flows in Rattlesnake Creek diminished precipitously after 1980, and have not regained their pre-1970 average flows.

105.    As early as 1986, the Service observed the harmful effects of junior, upstream and up-gradient groundwater pumping upon Rattlesnake Creek streamflow, and notified KDA-DWR of its concerns about how that pumping was interfering with the Refuge Water Right. Impairment Report at 18.

106.    GMD5 created a groundwater model that estimated that by 1987, junior groundwater pumping had depleted Rattlesnake Creek streamflow by about 38,000 acre-feet, or over 12 billion gallons.  *Id.* at 19. (One acre-foot is 325,851 gallons.)

107.    In a letter dated May 27, 1994, then-chief engineer David Pope, P.E., acknowledged that junior groundwater pumping likely reduced the amount of water the Refuge Water Right may otherwise have been able to divert, but he nevertheless limited certification of the Refuge Water Right to no more than it had actually diverted and used.  *Id.*

108.    Despite the fact that the Service had originally filed for the right to divert 22,200 acre-feet of water in 1957, in 1996—through a mechanical application of the KWAA and related regulations—KDA-DWR certified a permit for the Refuge for only 14,632 acre-feet, a neat two-thirds of its original authorized quantity.

109.    Even with this dramatically reduced certified quantity, the Refuge continued to be regularly prevented from exercising the Refuge Water Right in full due to the lack of administration of junior water rights within the the Rattlesnake Creek basin.  *Id.* at 25–29.

110.    During the period in which KDA-DWR evaluated the diversion of water from Rattlesnake Creek and the beneficial use of water on the Refuge for the purpose of perfecting the Refuge Water Right according to the KWAA, the Service and KDA-DWR were fully aware of depletions in flows of Rattlesnake Creek that were caused by the development of junior groundwater irrigation surrounding the Refuge.

111.    On April 8, 2013, after attempts at seeking voluntary reductions to improve the flow of water to the Refuge, the Service filed a formal request with KDA-DWR for an impairment investigation pursuant to K.S.A. § 82a-706b and K.A.R. § 5-4-1.

112.    An impairment investigation was conducted under the supervision of chief engineer Barfield, who published the Impairment Report on July 15, 2016.

113.    In the Impairment Report, the chief engineer found the Refuge Water Right to be impaired. He made a specific finding that "junior groundwater pumping within the Basin is and has been significantly reducing water availability at the Refuge in the order of 30,000-60,000 acre-feet per year over the recent record (1995-2007)".  Impairment Report at 2.

114.    The chief engineer further found that junior groundwater pumping has been impairing the Refuge Water Right for more than three decades. "Over the last 34 years reviewed, shortages—when junior groundwater pumping prevented the Refuge from exercising its water right—were greater than 3,000 acre-feet in 18 years, particularly during periods of limited water supply." *Id.* at 3.

115.    Based upon the historical simulations used in making his determination of impairment, the chief engineer further stated "while it will take years, reductions in groundwater pumping will restore streamflow at the Refuge," and furthermore, "[l]ong term reductions in upstream, junior groundwater pumping and/or the use of augmentation appear to be the only practical physical remedies of the Refuge's water right." *Id.*

**Failure to Protect the Refuge Water Right and the Harm that has Ensued**

116.    In a letter to the Service dated the same day as the publication of the Impairment Report, July 15, 2016, chief engineer Barfield stated that he would take no action to remedy the impairment of the Refuge Water Right without the written request of the Service to secure water pursuant to K.A.R. § 5-4-1.

117.    Since at least 2016, GMD5 has been preparing various iterations of a LEMA management plan pursuant to K.S.A. § 82a-1041, a voluntary water-management option that

other groundwater management districts in Kansas have employed to conserve groundwater. On September 8, 2016, GMD5 submitted a draft "Request for Rattlesnake LEMA" to KDA-DWR. This draft plan contains no date certain for water use reductions within GMD5, no fixed water use reductions, and no other firm commitments. This was the first of numerous LEMA proposals that KDA-DWR would find to be unacceptable.

118.    In a letter to GMD5 dated December 8, 2016, Kansas secretary of agriculture, Dr. McClaskey, stated that KDA-DWR would not administer junior water rights in the Rattlesnake Creek sub-basin during 2017—including all rights that chief engineer Barfield had found were impairing the Refuge Water Right. *See* Exhibit 3.

119.    On January 17, 2017, the Service filed a request to secure water pursuant to K.A.R. § 5-4-1 to protect the Refuge Water Right from the impairment and injury caused by junior groundwater pumping which KDA-DWR had described fully in the Impairment Report. *See* Exhibit 4.

120.    Despite the Service's January 17, 2017 request to secure water for the 2017 irrigation season, the chief engineer did not administer junior water rights in the Rattlesnake Creek sub-basin to protect the Refuge Water Right in 2017.

121.    Instead, KDA-DWR deferred to GMD5, providing it time to recommend how to regulate the junior water rights that are impairing the Refuge Water Right—even though GMD5 has no regulatory authority over the administration of water rights.

122.    On September 6, 2017, AOK wrote the chief engineer a detailed letter setting forth the applicable law concerning the impairment of the Refuge Water Right, requesting a full, substantive response to the legal issues set forth in the letter, and a plan by KDA-DWR to protect the Refuge in accordance with federal and state law. *See* Exhibit 5.

123.    KDA-DWR's response on September 29, 2017 disputed none of the facts contained in AOK's September 6, 2017 letter, but addressed none of the legal issues set forth in the same. *See* Exhibit 6.

124.    Chief engineer Barfield instead indicated that the matter of the impairment of the Refuge Water Right would be deferred to GMD5.

125.    The Service received but did not reply to AOK's September 6, 2017 letter.

126.    Between 2017 and 2019, KDA-DWR and GMD5 met multiple times and exchanged many documents and technical analyses, but GMD5 has yet to propose a LEMA to KDA-DWR pursuant to K.S.A. § 82a-1041 that the chief engineer has found to be acceptable.

127.    On December 13, 2017, KDA-DWR renewed secretary McClaskey's promise of December 8, 2016 not to administer junior water rights or otherwise protect the Refuge, this time for 2018. *See* Exhibit 7.

128.    On January 1, 2018, the Service filed a Request to Secure Water for the Refuge Water Right for 2018.

129.    The chief engineer did not secure water for the Refuge Water Right at any time in 2018 by administering junior rights or by taking any other regulatory action, despite the findings of the Impairment Report and despite the Service's Request to Secure Water.

130.    On February 15, 2018, GMD5 submitted a draft "Request for Rattlesnake LEMA" to DWR. Like its earlier proposal of September 8, 2016, it contained no date certain, no fixed reductions, and no other firm commitments.

131.    On February 16, 2018, chief engineer Barfield responded to the February 15, 2018 GMD5 "Request for Rattlesnake LEMA" with a powerpoint presentation which he gave in St. John, Kansas.

132.    In this presentation, chief engineer Barfield stated that DWR would not expect a LEMA from GMD5 to address the impairment of the Refuge Water Right until 2020 at the earliest.

133.    In the same presentation, chief engineer Barfield also stated that DWR would be satisfied with a LEMA plan that merely reduced the rate of groundwater depletions. By doing so, chief engineer Barfield took the position that the Refuge Water Right did not deserve to be protected by restoring the hydrological conditions to those existing at the time the Refuge was established, much less the historic conditions of the Refuge area as they existed prior to the activities of man, as required by NWRSIA.

134.    Mr. Barfield is a licensed professional engineer who has been admitted as an expert by the Supreme Court of the United States in original actions. Throughout his long career at KDA-DWR, Mr. Barfield distinguished himself through his successful efforts to protect surface water supplies allocated to Kansas by interstate compacts.

135.    In his capacity as an expert, as the Kansas chief engineer, and as the Kansas commissioner for the Arkansas River and Republican River Compact Administrations, he repeatedly provided expert reports and testimony before the Court regarding the impacts of excessive groundwater pumping upon streamflows.

136.    In these capacities, Mr. Barfield testified before the Court that for stream systems to recover from excessive groundwater pumping, merely reducing the rate of groundwater depletions is insufficient; rather, the depletions themselves must be reversed and eliminated.

137.    In these capacities, Mr. Barfield has also testified before the Court in support of permanent retirements of hundreds of thousands of acres of irrigated land to reduce the excessive groundwater pumping that causes long-term stream depletions.

138.     In these capacities, Mr. Barfield has also testified before the Court in support of injunctive relief forbidding groundwater pumping that violates federal law.

139.     In these capacities, Mr. Barfield has repeatedly opposed so-called "augmentation" projects in Nebraska and Colorado that pump groundwater and pipe it into surface water bodies to temporarily compensate for the depleting effects of excessive groundwater pumping on stream flows. He consistently opposed such projects on the grounds that augmentation does not address the root cause of stream depletion: groundwater over-pumping.

140.     On March 13, 2018, Governor Jeff Colyer, M.D., issued Executive Order 18-11, a Drought Declaration for all of Kansas. Stafford County, where most of the Refuge is located, was under a Drought Emergency according to that declaration.

141.     The Service took no action to protect the Refuge Water Right in response to Governor Collyer's 2018 Drought Declaration, even though the spring migration of migratory birds which depend upon the Refuge was well underway.

142.     KDA-DWR took no regulatory action regarding the Refuge in response to Governor Collyer's 2018 Drought Declaration, despite the official Drought Emergency at the Refuge.

143.     On August 17, 2018, AOK again wrote the Service and KDA-DWR, complaining of the following: the lack of administration of junior groundwater rights that KDA-DWR had found to be impairing the Refuge Water Right; complaining of secretary McClaskey's and chief engineer Barfield's explicit refusal to so administer; and requesting that the Service make clear its request to secure water pursuant to K.A.R. § 5-4-1(d). In the same letter AOK attempted to file a request to secure water on the Refuge's behalf.  *See* Exhibit 8.

144.     On August 27, 2018, KDA-DWR responded to AOK's August 17, 2018 letter by acknowledging the Service's request to secure water for 2018, but placed responsibility for addressing the impairment of the Refuge upon GMD5, through the establishment of a LEMA. *See* Exhibit 9.

145.     On December 13, 2018, the Service filed a request to secure water to protect the Refuge Water Right "from injury due to junior groundwater wells" for the 2019 irrigation season.  *See* Exhibit 10.

146.     Despite the Service's request, KDA-DWR did not, in 2019, administer junior groundwater rights that it had previously found were impairing the Refuge Water Right according to the Impairment Report.

147.     On June 30, 2019, chief engineer Barfield rejected a LEMA proposal from GMD5, on the grounds that it was inadequate to address and remedy the impairment of the Refuge Water Right.

148.     On August 16, 2019, AOK sent a third letter to KDA-DWR, complaining of continued inaction at the Refuge. *See* Exhibit 11.

149.     During the late summer and fall of 2019, KDA-DWR prepared a plan to administer water rights junior to the Refuge Water Right in the Refuge Area for the years 2020 through 2022. The chief engineer sent all affected water users notice of this plan. KDA-DWR held a public meeting in St. John, Kansas on October 21, 2019, in which KDA-DWR staff planned to explain the plan.

150.     During the summer and fall of 2019, Senator Roger Marshall, then serving as United States Representative for Kansas's First Congressional District, sought and obtained repeated in-person and/or telephonic meetings with secretary Beam, in which Representative

Marshall emphasized his desire that the junior water rights that were impairing the Refuge Water Right not be administered, despite the chief engineer's clear and non-discretionary duty to do so.

151.    During the Fall of 2019, United States Senator Jerry Moran sought and obtained in-person and/or telephonic meetings with Director Skipwith and secretary Beam, in which Senator Moran likewise emphasized his desire that the junior water rights that were impairing the Refuge Water Right not be administered, despite the chief engineer's clear and non-discretionary duty to do so.

152.    In October, 2019, Senator Moran and Director Skipwith, neither of whom has jurisdiction over the administration of water rights in Kansas, announced a bargain: The Service would withdraw its request to secure water for the Refuge Water Right, in exchange for GMD5 and KDA-DWR working together to find an adequate solution to the Refuge's water-shortage problem by 2020.  *See* Exhibit 12.

153.    Following discussions with then-Representative (now Senator) Marshall, Senator Moran, and Director Skipwith, secretary Beam agreed to the bargain set forth in the preceding paragraph.

154.    Just prior to the meeting in St. John, Kansas on October 21, 2019, in which chief engineer Barfield and his professional staff were to explain KDA-DWR's planned administration of junior water rights, the Service informed KDA-DWR that it was apparently withdrawing its request to secure water.

155.    On October 25, 2019, the Service provided written notice to KDA-DWR that it would not make a written request for water to protect the Refuge Water Right during the 2020 irrigation season, and would instead:

> "work to find local, voluntary, collaborative and non-regulatory
> solutions, including augmentation, to address the water needs of the

community and the wildlife purposes of the refuge before determining if more formal measures are necessary to ensure the refuge's water rights are secured. We look forward to working with the Kansas Department of Agriculture, the Kansas congressional delegation, and all water users to develop concrete milestones and lasting solutions." *See* Exhibit 13.

156.    Chief engineer Barfield did not object to or oppose the bargain set forth in the preceding paragraphs. In response to that bargain, he withdrew the KDA-DWR plan to administer junior water rights whose operation were and are continuing to impair the Refuge Water Right.

157.    Between October 2019 and summer, 2020, negotiations and discussions among the Service, KDA-DWR, and GMD5 took place.

158.    On July 25, 2020, the Service and GMD5 executed a Memorandum of Agreement ("2020 MOA"), attached as Exhibit 14. Its relevant provisions reflect a second bargain: in exchange for GMD5's promises to conduct certain preliminary activities related to building an augmentation wellfield and preliminary activities related to purchasing water rights to supply water for the Refuge, the Service agreed not to protect the Refuge Water Right "to address its impairment in 2020 and 2021." 2020 MOA at 4.

159.    The 2020 MOA contains no dates certain by which GMD5 will complete the augmentation wellfield or obtain additional water rights for the Refuge.

160.    During 2020, water-supply conditions in the Refuge area qualified as "DO (Abnormally Dry)" according the United States Geological Survey,

https://droughtmonitor.unl.edu/CurrentMap/StateDroughtMonitor.aspx?High_Plains

161.    KDA-DWR did not administer any junior water rights in 2020 that, according to his own Impairment Report, are impairing the Refuge Water Right.

162.     In December, 2020, Director Skipwith announced that the Service would not file a Request to Secure Water to Protect the Refuge Water Right. Instead, Director Skipwith stated that the Service would "try to find a commonsense solution that is equitable to us all . . . ." *See* Exhibit 15.

163.     Absent a LEMA or an IGUCA, the prior appropriation doctrine codified in Kansas water law forecloses "equitable" solutions. In times of shortage, first in time is first in right. K.S.A. § 82a-707(c). Under the doctrine of prior appropriation, priority *is* equity.

## CLAIMS FOR RELIEF

### COUNT ONE

### VIOLATION OF THE NATIONAL WILDLIFE REFUGE SYSTEM IMPROVEMENT ACT AND THE ADMINISTRATIVE PROCEDURE ACT

164.     Plaintiff realleges and incorporates the allegations in the above paragraphs by reference.

165.     By repeatedly subordinating the needs of the Refuge to the interests of GMD5 and its constituent junior groundwater rights holders, and by surrendering to the requests of Kansas politicians, the government defendants have willfully ignored and defied their statutory duties under NWRSIA.

166.     The decision made by the government defendants to not protect the Refuge Water Right has harmed and will continue to harm the biological integrity, diversity, and environmental health of the Refuge and the National Wildlife Refuge System as a whole.

167.     In his official capacity as Secretary of the Interior, Secretary Bernhardt has violated and continues to violate his statutory duties under NWRSIA by failing to protect the Refuge Water Right, and by failing to secure adequate water of sufficient quantity and quality for the Refuge. *See* H.R. Rep. No. 105-106, at 10 (1997) (stating: "[t]he [NWSRIA] directs the

Secretary to assist in the maintenance of adequate quantities and quality of water to fulfill the mission of the System and the needs of each refuge.  In doing so, the [NWSRIA] imposes a new, more specific, obligation on the Secretary. . . . [T]he Secretary must rely on existing authority, such as the authority to: acquire water rights with appropriated funds; improve the operations of Federal agencies with respect to the identification and protection of relevant water rights; purchase water; and participate in State water rights adjudications to perfect and defend relevant water rights.")

168.    In her official capacity as Director of the Service, Director Skipwith has violated and continues to violate her statutory duties under NWRSIA by failing to protect the Refuge Water Right, and by failing to secure adequate water resources of sufficient quantity and quality for the Refuge.

169.    The October, 2019 bargain reached among the Service, KDA-DWR, and GMD5 as described above in paragraph 152 is *ultra vires* and void because it commits the Service to violate NWRSIA by committing it to leave the Refuge Water Right unprotected.

170.    Likewise, the 2020 MOU as described above in paragraph 158 is *ultra vires* and void because it commits the Service to violate NWRSIA by committing it to leave the Refuge Water Right unprotected.

171.    In his official capacity as Kansas Secretary of Agriculture, secretary Beam has violated and continues to violate NWRSIA by interfering with KDA-DWR's statutory duty to protect the Refuge Water Right according to the KWAA and the prior appropriation doctrine.

172.    Plaintiff has been harmed and will continue to experience harm to its interests as a result of the government defendants' failure to protect the Refuge Water Right.

**COUNT TWO**

**VIOLATION OF THE ENDANGERED SPECIES ACT**

173.    Plaintiff realleges and incorporates the allegations in the above paragraphs by reference.

174.    By willfully failing to secure water to which the Refuge Water Right was entitled after KDA-DWR found that it was chronically impaired, each of the government defendants have knowingly taken, harmed, and harassed wildlife as those terms are defined under the ESA in violation of its provisions.

175.    The decision not to protect the Refuge Water Right has jeopardized and continues to jeopardize the survival of various endangered and threatened species, and threatens the further adverse modification of their habitat.

176.    Furthermore, the government defendants did not simply fail to "use the best scientific and commercial data available" prior to making a decision that could adversely affect endangered and threatened species, but rather chose to willfully ignore such data altogether by failing to consider the Impairment Report and its recommendations.

177.    The government defendants' decision to not protect the Refuge Water Right was not based upon the best scientific data available, but was instead based upon the fear of making a decision that would be unpopular with irrigation and agribusiness interests.

178.    The ESA does not permit the government defendants to consider what is politically convenient in making decisions having adverse effects upon endangered and threatened species.

179.    The bargain reached among the Service, KDA-DWR, and GMD5 as described above in paragraph 152 is *ultra vires* and void because it commits the Service to violate the ESA

by committing it to leave the Refuge Water Right and the habitat which depends upon it unprotected.

180.     Likewise, the 2020 MOU as described above in paragraph 158 is *ultra vires* and void because it commits the Service to violate the ESA by committing it to leave the Refuge Water Right and the habitat which depends upon it unprotected.

181.     Plaintiff has been harmed and will continue to experience harm to its interests as a result of the government defendants' failure to protect the Refuge Water Right, and is additionally entitled to seek review of the government defendants' actions under the citizen suit provision of the ESA. And as set forth above in paragraphs 30–40, the Plaintiff is entitled to injunctive relief under the ESA.  The willful neglect of the Refuge Water Right has created a hydrological emergency.

<u>**COUNT THREE**</u>

**VIOLATION OF THE NATIONAL ENVIRONMENTAL POLICY ACT**

182.     Plaintiff realleges and incorporates the allegations in the above paragraphs by reference.

183.     Because each refuge within the System is part of a larger interconnected whole, and harm suffered by one refuge can have a negative domino effect across the entire national Refuge System (especially in relation to migratory wildlife), the decision of the government defendants to seek voluntary augmentation in lieu of administering junior water rights that are impairing the Refuge Water Right constitutes a major Federal action significantly affecting the quality of the environment according to NEPA.

184.     Before the government defendants may take any such action in the furtherance of any augmentation, they must first satisfy NEPA's requirements, including providing formal

detailed statements describing the environmental impact of the proposed actions, any adverse environmental effects that cannot be avoided should the proposal be implemented, and a description of appropriate alternatives that would show the government defendants properly weighed all relevant factors in their decision-making process, and made their decision based upon the best data available.

185.    The government defendants failed to follow the procedural requirements of NEPA, as no detailed statements regarding the environmental impact of and alternatives to the suggested action have been issued.

186.    The bargain reached among the Service, KDA-DWR, and GMD5 as described above in paragraph 152 is *ultra vires* and void because it commits the Service to violate NEPA by committing it to leave the Refuge Water Right unprotected absent NEPA review—a commitment that clearly constitutes major federal action affecting the environment.

187.    Likewise, the 2020 MOU as described above in paragraph 158 is *ultra vires* and void because it commits the Service to violate NEPA by committing it to leave the Refuge Water Right unprotected absent NEPA review—a commitment that clearly constitutes major federal action affecting the environment.

188.    Plaintiff is entitled to appropriate declaratory relief for the government defendants' procedural violations of NEPA.

## COUNT FOUR

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

189.    Plaintiff realleges and incorporates the allegations in the above paragraphs by reference.

190.     The actions of the federal defendants in failing to secure the Refuge Water Right violate the APA.  The APA forbids agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.A. § 706(2)(A).  It also forbids action taken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," as well as those taken "without observance of procedure required by law."  5 U.S.C.A. § 706(2)(C), (D).

191.     The federal defendants' failures to take action in defending the Refuge's senior water right constituted unlawful agency action because it violated NWRSIA, the ESA, and NEPA.  The federal defendants therefore violated the APA.

192.     The decision of the federal defendants to ignore their statutory duties under NWRSIA, the ESA, and NEPA and to revert instead to the impotent policy of requesting voluntary reductions in water use by junior irrigators constitutes an arbitrary and capricious action under the APA, as well as an abuse of agency discretion.

193.     Furthermore, because the actions constitute a de facto revision of the 2013 CCP for the Refuge, they are also unlawful for a failure to observe the procedure required by law to revise a CCP.

194.     Plaintiff has no adequate or available administrative remedy.

## COUNT FIVE

## CLAIM FOR ADDITIONAL WATER RIGHTS AND WATER SUPPLY

195.     Plaintiff realleges and incorporates the allegations in the above paragraphs by reference.

196.     NWRSIA establishes a clear duty for the Service to acquire water rights sufficient to maintain the Refuge at historic conditions. As set forth above in paragraphs 96–98, the Service

applied for and received a water right with an initial authorized annual quantity of 22,200 acre-feet in 1957.

197.    Yet as set forth above in paragraph 108, KDA-DWR certified the Refuge Water Right with an authorized annual quantity substantially smaller than 22,200 acre-feet—14,632 acre-feet, which is a neat two-thirds of the Service's original determination that the Refuge would require 22,200 acre-feet annually.

198.    Moreover, as set forth above in paragraphs 102-110, KDA-DWR conducted the perfection and certification of the Refuge Water Right during a period in which then-chief engineer Pope knew that junior groundwater pumping in the hydrological vicinity of the Refuge Water Right was preventing the Service from diverting 22,200 acre-feet annually—for which it had obtained KDA-DWR approval to divert as of the date of the approval of its application.

199.    Had the hydrological conditions of 1955—the date of the establishment of the Refuge—remained during the period in which the Refuge Water Right was perfected and certified, the Refuge Water Right would likely have been certified in an annual authorized quantity approximating that of its original approval, 22,200 acre-feet. The Refuge Water Right is thus significantly smaller in authorized annual quantity than the Service sought to obtain in 1957.

200.    The Impairment Report found that the Refuge Water Right, even in its dramatically diminished, certified annual authorized quantity, has been chronically impaired by junior groundwater pumping; as a consequence, the Refuge has not received, for over three decades, the water supplies necessary to fulfill the mandates of NWRSIA and the ESA.

201.    As set forth above in paragraphs 18–23, NWRSIA's biological integrity and biological diversity mandates require that the Refuge hold sufficient water rights to maintain and preserve original historic conditions—in this case, the hydrological condition of the Refuge area

prior to substantial human-related changes to the landscape, which began to occur in the Refuge area shortly after the establishment of the Kansas Territory in 1854. At minimum, these historical hydrological conditions are those that existed around the Refuge in May, 1955, at the time of the establishment of the Refuge.

202.    NWRSIA also requires the Service to assist in the maintenance of adequate water quantity and water quality to fulfill the mission of the Refuge System. As set forth above in paragraphs 94–95, the unique salt-and-freshwater mix of the Refuge is a critical component of the Refuge's water resources. That mix depends upon the protection of the Refuge's hydrological system as a functioning open basin, rather than a basin that, as a result of excessive groundwater pumping, has deviated from historical conditions and lost much of its streamflow and groundwater baseflow. Because any augmentation plan that uses existing groundwater rights junior to the Refuge Water Right to pump native groundwater directly into Rattlesnake Creek only serves to increase that deviation from historical conditions, any such augmentation plan is legally defective under NWRSIA.

203.    As detailed in the Impairment Report, the Refuge Water Right has long been insufficient to meet the mandates of NWRSIA and other federal statutes; the Refuge has long suffered from insufficient water supply.

204.    Because junior groundwater pumping prevented the perfection and certification of the Refuge Water Right at its originally approved quantity of 22,200 acre-feet; because its certified quantity is inadequate to meet the needs of the Refuge; because NWRSIA requires the Refuge to hold water rights sufficient to satisfy NWRSIA's "historic conditions" requirement; because the ESA similarly requires that the Refuge hold water rights and protect habitat upon which listed species depend; and because the *Winters/Cappaert* federal reserved water rights

doctrine requires that the Refuge hold water rights sufficient to satisfy the Refuge's purposes, the Refuge is therefore entitled to substantial additional water rights of sufficient quantity and priority to meet these legal requirements.

205.    The Service must accordingly obtain additional water supplies for the Refuge. It can do so in three ways. First, it can secure additional rights through the long-recognized doctrine of federal reserved water rights, as described above in paragraphs 53–54. Under the doctrine, the Refuge is entitled to a federal, reserved water right, with a May, 1955 priority (the date of the establishment of the Refuge), that supplies water of sufficient quantity and quality to ensure that the preservation mandates of NWRSIA—the primary purpose of the Refuge—are met. *Winters v. United States*, 207 U.S. 564 (1908); *Arizona v. California*, 373 U.S. 546, 375 U.S. 892 (1963); *Cappaert v. United States*, 462 U.S. 128 (1976); *United States v. New Mexico*, 438 U.S. 696 (1978).

206.    Second, the Service can obtain existing state law water rights recognized and obtained pursuant to the KWAA, either through voluntary acquisition or through the exercise of eminent domain. 16 U.S.C. § 668dd(a)(4)(G). However acquired, these state-law water rights must be of sufficient quantity and sufficiently senior priority to fulfill the legal requirements set forth under NWRSIA, the ESA, and the federal reserved water rights doctrine. Once obtained, state-law water rights can then be changed pursuant to K.S.A. § 82a-708b to supply the Refuge.

207.    In combination with the previous two methods, which require the acquisition of additional water rights, the Service can protect the Refuge Water Right and at least partially restore its historic hydrological conditions by obtaining orders from this Court and from KDA-DWR requiring the long-term curtailment of all junior groundwater rights that have been impairing the Refuge Water Right. Permanent injunctive relief to protect senior water rights from

junior water rights whose pumping has been found to impair senior rights is the standard court-ordered remedy in Kansas. *Garetson Brothers. v. American Warrior, Inc.*, 51 Kan.App.2d 370, 347 P.3d 687 (2015); *Garetson Brothers v. American Warrior, Inc.*, 56 Kan.App.2d 623, 435 P.3d 1153 (2019). The same hydrological result can be obtained by the permanent administration of such impairing junior rights. K.S.A. § 82a-706b. In prior appropriation jurisdictions, either action to curtail junior water rights to protect senior water rights such as the Refuge Water Right raises no takings issues under the United States Constitution or state constitutions, because all junior water rights holders hold their rights subject to senior rights. *See, e.g., Kobobel v. Department of Natural Resources*, 249 P.3d 1127 (Colo. 2011).

## COUNT SIX

**VIOLATION OF THE PROHIBITION OF DISPOSING OF FEDERAL PROPERTY**

208.     Plaintiff re-alleges and incorporates the allegations in the above paragraphs by reference.

209.     The Refuge Water Right is a real property right held by the Service. K.S.A. § 82a-701(g). Federal law clearly prohibits the disposition of federal property, which includes the diminution of the Refuge Water Right. Neither Interior, the Service, nor KDA-DWR can dispose of or diminish the Refuge Water Right by negotiation with GMD5, Senators Moran and Marshall, or other politicians. Only Congress, and not an executive branch agency such as Interior or the Service, can authorize the disposition of federal property. This rule dates back at least to *Gibson v. Chouteau,* 80 U.S. 92, 99 (1871).

210.     For every year in which the Refuge Water Right was impaired, and the governmental defendants knew about that impairment but failed to secure water to which the Refuge Water Right was entitled, they knowingly disposed of a substantial portion of that federal

property for that season. In so doing, the governmental defendants violated the prohibition against disposing of federal property without congressional consent.

211.    For the same reasons, neither can the governmental defendants place a burden (such as an easement for augmentation purposes) on Refuge land that diminishes the value of the Refuge property.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff respectfully requests that this Court make the following **Declarations:**

1.    The government defendants violated NWRSIA and the APA by willfully failing to protect the Refuge Water Right, a failure which began during the 1980s and continued after KDA-DWR issued the Impairment Report on July 15, 2016.

2.    The government defendants committed a taking of wildlife in violation of the ESA and its related regulations.

3.    NWRSIA imposes upon the government defendants the affirmative duty to protect the historic hydrological conditions of the Refuge that were in place in the Refuge area as of the time prior to human settlement.

4.    The duty set forth in Declaration 3 requires the government defendants to fully protect every attribute of the Refuge Water Right from any interference by junior water rights.

5.    Pursuant to NWRSIA and the ESA, the Refuge has a valid claim to federal reserved water rights and/or additional Kansas water rights necessary to restore, protect, and maintain the hydrological conditions of the Refuge as they existed prior to human settlement.

6.    The October, 2019 bargain among the Service, KDA-DWR, and GMD5, and the 2020 MOU between the Service and GMD5 are void, ultra vires and ab initio, because they

violate NWRSIA, the ESA, the APA, and NEPA, and were entered into by officials without authority to make such agreements binding.

7.      The Service's decision not to protect the Refuge Water Right constitutes major federal action affecting the environment that was done without fulfilling the requirements of NEPA, thus violating NEPA and the APA.

8.      Any proposal for an augmentation project to supply water to the Refuge is major federal action affecting the environment and requires NEPA review.

9.      NWRSIA requires that any augmentation plan approved by the chief engineer must be dedicated to the purpose of restoring, as soon as is practicable, the hydrological conditions in place at the Refuge prior to human settlement.

10.     Any augmentation plan that proposes to change existing groundwater rights from within the Rattlesnake Creek sub-basin to a use that merely transfers the water diverted under such rights into Rattlesnake Creek does not physically add water to the Rattlesnake Creek sub-basin, and disrupts the hydrological conditions in place at the Refuge prior to human settlement; thus, any such plan cannot be approved by the chief engineer because it violates NWRSIA and the ESA.

11.     The Service's deliberate decision not to protect the Refuge Water Right from known impairment constitutes a disposal of federal property in violation of federal law.

12.     NWRSIA requires the chief engineer to issue orders to administer junior water rights sufficient to restore and to maintain the hydrological integrity of the source of supply of the Refuge Water Right, the Rattlesnake Creek sub-basin, at the level of the basin's historic conditions prior to human settlement.

13. Any order issued by the chief engineer to administer junior water rights that condones any depletions of groundwater supplies within the Rattlesnake Creek sub-basin beneath historic conditions prior to human settlement violates NWRSIA.

14. NWRSIA requires that any order issued by the chief engineer pursuant to K.S.A. § 82a-1036 to establish an IGUCA for the Rattlesnake Creek sub-basin must restore and protect the historic hydrological conditions of the basin prior to human settlement.

15. NWRSIA requires that any order issued by the chief engineer pursuant to K.S.A. § 82a-1041 to establish a LEMA for the Rattlesnake Creek sub-basin must restore and protect the historic hydrological conditions of the basin prior to human settlement.

Plaintiff further requests this Court to issue an **injunction** effecting the following:

16. The governmental defendants shall be permanently enjoined from taking any action that impairs the restoration, protection, and maintenance of the hydrologic conditions of the Rattlesnake Creek sub-basin according to the "historic conditions" standard of NWRSIA.

17. The governmental defendants shall be permanently enjoined from taking any action that impairs the restoration, protection, and maintenance of the hydrologic conditions necessary to protect the Refuge and the Refuge Water Right according to the ESA.

18. Interior and the Service shall take all affirmative actions necessary to restore, protect, and maintain the Refuge to its historic hydrological conditions prior to human settlement, in accordance with the above-made Declarations.

19. Specifically, the Service shall take immediate action to obtain sufficient federal reserved and/or Kansas water rights, consistent with its duty set forth in Declaration 3, to obtain additional water rights of sufficient priority and authorized quantity that, when combined with

the Refuge Water Right, are sufficient to restore, protect, and maintain the hydrological balance of the Rattlesnake Creek sub-basin to its historic conditions prior to human settlement.

20.     All water rights which the chief engineer has found to be impairing the Refuge Water Right according to the Impairment Report are immediately prohibited from diverting any water, and this prohibition shall remain in effect until this Court approves an order by the chief engineer for the administration of the Rattlesnake Creek sub-basin that is consistent with the requirements of NWRSIA, the ESA, and NEPA.

Plaintiff further requests this Court issue an **Order of Mandamus** ordering the following:

21.     Interior and the Service shall immediately fulfill their non-discretionary duty to protect the Refuge Water Right by requesting the full administration of all water rights in the Rattlesnake Creek sub-basin that have impaired and are impairing the Refuge Water Right according to the Impairment Report.

22.     Chief engineer Lewis shall fulfill his non-discretionary duty to comply with this request and shall immediately and fully administer all junior water rights in the Rattlesnake Creek sub-basin that, according to the Impairment Report, have impaired and are impairing the Refuge Water Right.

Finally, Plaintiff requests that this Court:

23.     Find that the position of the government defendants was not substantially justified, and that as a result, the Plaintiff is to be awarded its costs of litigation, reasonable attorney fees, and other disbursements for this action, and there exists no special circumstances that would make such an award unjust.

Dated: January 15, 2021                    Respectfully Submitted,

                                           DEPEW GILLEN RATHBUN & MCINTEER, LC

                                           /s/ Randall K. Rathbun
                                           Randall K. Rathbun #09765
                                           Dylan P. Wheeler #28661
                                           8301 E. 21st Street N., Suite 450
                                           Wichita, KS 67206-2936
                                           Telephone: (316)-262-4000
                                           Facsimile: (316)-265-3819
                                           randy@depewgillen.com
                                           dylan@depewgillen.com

                                           Richard Seaton #05994
                                           SEATON, SEATON & DIERKS, L.L.P
                                           410 Humboldt Street, Suite 6031
                                           Manhattan, KS 66502
                                           Telephone: (785)-776-4788
                                           rhseaton@yahoo.com

                                           Burke W. Griggs #22805
                                           GRIGGS LAND & WATER, LLC
                                           1717 W. 7th Street
                                           Lawrence, KS 66044
                                           burke.griggs@gmail.com

                                           *Attorneys for Plaintiff*

                        DESIGNATION OF PLACE OF TRIAL

COMES NOW the plaintiff and designates Kansas City, Kansas, as the place of trial.

                                           Respectfully Submitted,

                                           DEPEW GILLEN RATHBUN & MCINTEER, LC

                                           /s/ Randall K. Rathbun
                                           Randall K. Rathbun #09765
                                           Dylan P. Wheeler #28661
                                           8301 E. 21st Street N., Suite 450
                                           Wichita, KS 67206-2936
                                           Telephone: (316)-262-4000
                                           Facsimile: (316)-265-3819
                                           randy@depewgillen.com
                                           dylan@depewgillen.com

Richard Seaton #05994
SEATON, SEATON & DIERKS, L.L.P
410 Humboldt Street, Suite 6031
Manhattan, KS 66502
Telephone: (785)-776-4788
rhseaton@yahoo.com

Burke W. Griggs #22805
GRIGGS LAND & WATER, LLC
1717 W. 7th Street
Lawrence, KS 66044
burke.griggs@gmail.com

*Attorneys for Plaintiff*