## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**AUDUBON OF KANSAS, INC.,**

      **Plaintiff,**

      **v.**                         **Case No. 2:21-cv-02025-HLT-JPO**

**UNITED STATES DEPARTMENT OF INTERIOR, et al.,**

      **Defendants.**

## MEMORANDUM AND ORDER

This is a water-rights action by Plaintiff Audubon of Kansas, Inc. against various state and federal authorities. Audubon challenges federal agency action and inaction that it contends fail to protect water rights that supply a wildlife refuge in Kansas. Defendants all move to dismiss. Docs. 25 and 27. For the reasons stated below, the Court grants both motions to dismiss. Specifically, State Defendants are entitled to Eleventh Amendment immunity on all claims asserted against them. Federal Defendants are likewise entitled to sovereign immunity on grounds that Audubon has not established any "final agency action" that permits them to sue under the APA. Accordingly, the Court concludes that all claims in this case should be dismissed.

## I.    BACKGROUND[1]

### A.    Relevant Parties and Entities

The Quivira National Wildlife Refuge ("Refuge") is an important wetland that provides sanctuary to a wide variety of waterfowl and other wetland species. It was established in 1955 and encompasses 22,135 acres dedicated to conservation and protection of numerous species.

---

[1] In keeping with the standard for evaluating motions to dismiss, the Court accepts as true the following facts as asserted in the amended complaint, which is the operative pleading. *See* Doc. 18.

Approximately 7,000 of the Refuge's acres are groundwater-dependent wetland ecosystems. The Refuge attracts hundreds of thousands of water birds annually, including threatened and endangered species, and is a primary pathway for many species of migrating birds due to its central location in Stafford, Reno, and Rice Counties in Kansas. The Refuge has a unique combination of rare inland salt marsh and sand prairies and is one of only 30 "Wetlands of International Importance."

The U.S. Fish and Wildlife Service ("Service") obtained water rights for the Refuge with a priority date of 1957 ("Refuge Water Right"). Aurelia Skipwith is the Director of the Service, which is an agency of the Department of the Interior. David Bernhardt is the Secretary of the Department of the Interior. Skipwith, as Director of the Service, and Bernhardt, as Secretary of the Department of the Interior, are collectively referred to as "Federal Defendants."

Michael Beam is the Secretary of the Kansas Department of Agriculture, which is a state agency that oversees the Kansas Division of Water Resources ("KDA-DWR"). Earl Lewis is the Chief Engineer of KDA-DWR. Beam, as Secretary of the Kansas Department of Agriculture, and Lewis, as Chief Engineer of KDA-DWR, are collectively referred to as "State Defendants."[2]

Audubon is a nonprofit organization with approximately 5,000 members. Its purpose is to promote the enjoyment, understanding, protection, and restoration of ecosystems with a focus on birds, other wildlife, and their habitats. Audubon engages in conservation work and advocacy. Audubon also provides education to its members and the public about the Refuge, and its members live near or regularly visit the Refuge and use or enjoy it for bird watching and other recreational, aesthetic, scientific, educational, or spiritual purposes. Audubon contends that State and Federal

---

[2]   The previous Chief Engineer of KDA-DWR was David Barfield, who is not named as a party but who is referenced throughout the complaint.

Defendants' failure to acquire, protect, and maintain an adequate water supply for the Refuge adversely affects its members' activities at the Refuge.

Although not named as a party, Big Bend Groundwater Management District No. 5 ("District") has intervened to file a brief in support of the motions to dismiss filed by State and Federal Defendants. The District is the "local governmental entity authorized by the KDA-DWR and the Kansas legislature to manage the water rights within the District's boundaries." Doc. 12 at 11. The Court granted the District leave to intervene as a defendant. *See* Doc. 19.[3]

### B.    Impairment Investigation

Relevant to the Refuge Water Right is Rattlesnake Creek, which is dependent on groundwater supplies. Flows in Rattlesnake Creek have been diminished since about 1980 compared to historic conditions. This is at least partially attributable to the effects of junior, upstream, and up-gradient groundwater pumping. The Service originally filed for the right to divert 22,200 acre-feet of water. But KDA-DWR certified a permit for the Refuge for only 14,632 acre-feet. Even still, the Refuge has been prevented from exercising the Refuge Water Right in full because of junior water rights involving Rattlesnake Creek's basin.

In 2013, the Service filed a request with the KDA-DWR for an impairment investigation of the Refuge Water Right under K.S.A. § 82a-706b and K.A.R. § 5-4-1. Barfield, the previous Chief Engineer of KDA-DWR, issued the Impairment Report in 2016. The Impairment Report found the Refuge Water Right was impaired and that "junior groundwater pumping within the Basin is and has been significantly reducing water availability at the Refuge in the order of 30,000-60,000 acre-feet per year over the recent record (1995-2007)." Junior groundwater pumping had

---

[3]    The District has also filed a brief in support of both motions to dismiss. Doc. 50.

been impairing the Refuge Water Right for over three decades, and it would take years to restore streamflow at the Refuge.

KDA-DWR informed the Service that it would not take any action to correct the impairment of the Refuge Water Right without a written request under K.A.R. § 5-4-1. In late 2016, the then-secretary of KDA stated that KDA-DWR would not administer any junior water rights in the Rattlesnake Creek basin in 2017.

### C.     Requests to Secure Water Rights

In 2017, the Service filed a request to protect the Refuge Water Right from impairment and injury due to the junior groundwater pumping identified in the Impairment Report. The Service filed another request in 2018. KDA-DWR didn't take any action in 2017 or 2018 despite a drought declaration being issued in the county where most of the Refuge is located and instead deferred to the District to recommend how to regulate the junior water rights. From 2017 through 2019, KDA-DWR and the District met several times, but the District did not propose any plan that was acceptable to KDA-DWR. The Chief Engineer of KDA-DWR at the time indicated that KDA-DWR didn't expect an adequate plan from the District until 2020 or later, and that KDA-DWR would be satisfied with a plan that merely reduced the rate of groundwater depletion, as opposed to restoring historic conditions of the Refuge. Even after complaints from Audubon, KDA-DWR put the responsibility of rectifying the impairment on the District.

The Service subsequently filed another request to secure the Refuge Water Right "from injury due to junior groundwater wells" for 2019. But KDA-DWR still failed to administer the junior groundwater rights that were impairing the Refuge Water Right. KDA-DWR also rejected proposals from the District in 2019.

But by late summer 2019, KDA-DWR had prepared a plan for administering the junior groundwater rights for the Refuge for 2020 through 2022. Just before public meetings regarding this plan, members of Kansas's Congressional delegation met with KDA Secretary Beam. The members of the Congressional delegation expressed a desire that the junior groundwater rights not be administered. In October 2019, Senator Jerry Moran and Service Director Skipwith announced a compromise. The Service indicated it would withdraw its request to secure the Refuge Water Right while the District and KDA-DWR worked together to find a solution to the Refuge's water-shortage by 2020. The Service subsequently withdrew its pending request to secure the Refuge Water Right. The Service also informed KDA-DWR that it would not make a request to secure the Refuge Water Right for 2020 and would instead "work to find local, voluntary, collaborative and non-regulatory solutions, including augmentation, to address the water needs of the community and the wildlife purposes of the refuge before determining if more formal measures are necessary to ensure the refuge's water rights are secured." KDA-DWR then withdrew its plan for administering the junior groundwater rights for the Refuge.

### D.       2020 Memorandum of Agreement

Between mid-2019 and mid-2020, the Service, KDA-DWR, and the District engaged in negotiations. On July 25, 2020, the Service and the District executed a Memorandum of Agreement ("2020 MOA"). The 2020 MOA reflected that, in exchange for the District's promise to conduct certain preliminary activities related to building an augmentation wellfield and purchasing water rights to supply water for the Refuge, the Service would not take action to address the impairment of the Refuge Water Right for 2020 and 2021. The 2020 MOA did not set forth any dates by which the District had to complete the augmentation wellfield or purchase additional water rights.

### E.   Lawsuit

In early 2021, Audubon filed this lawsuit. It subsequently amended its complaint and now asserts five counts. *See* Doc. 18. Count One asserts violations of the National Wildlife Refuge System Improvement Act ("NWRSIA") and the Administrative Procedure Act ("APA") against the "government defendants" for willfully ignoring their statutory duties under NWRSIA. Count Two asserts a violation of the National Environmental Policy Act ("NEPA") against the "government defendants" for failing to follow the procedural requirements of NEPA regarding the environmental impact of seeking voluntary augmentation of the junior water rights instead of administering them. Count Three asserts a violation of the APA by the "federal defendants"[4] for taking agency action that violates NWRSIA and NEPA. Count Four is a claim for additional water rights and water supply for the Refuge sufficient to restore it to historic conditions as required by NWRSIA. Count Five alleges a violation of the prohibition of disposal of federal property.

In its prayer for relief, Audubon seeks 14 declarations and a permanent injunction that restores the historic conditions of the Refuge and the Rattlesnake Creek basin. Audubon also seeks mandamus relief. Doc. 18 at 46-47. But Audubon has abandoned this request as to KDA-DWR Chief Engineer Lewis. Doc. 37 at 16 n.3.

Both State Defendants and Federal Defendants move to dismiss the case. Docs. 25 and 27.[5]

---

[4]   The complaint does not clearly set forth which counts are asserted against which defendants. It alternatively refers to "government defendants" and "federal defendants." The Court notes that all the defendants are part of either the state or federal government, so this distinction is not entirely clear. But as the parties seem to agree, it appears that Counts One through Five are asserted against Federal Defendants, and Counts One, Two, Four, and Five are asserted against State Defendants.

[5]   After briefing was complete, Audubon filed a request for oral argument. Doc. 53. The Court has considered the parties' extensive briefing and concludes that oral argument is not necessary and therefore denies the request.

## II.      STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible if it is accompanied by sufficient factual content to allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In undertaking this analysis, the Court accepts as true all well-pleaded allegations in the complaint, though it need not accept legal conclusions. *Id.* Likewise, conclusory statements are not entitled to the presumption of truth. *Id.* at 678-79. Dismissal is further warranted where an issue of law precludes recovery. *Neitzke v. Williams*, 490 U.S. 319, 326 (1989).

The Court may also dismiss a complaint for lack of subject-matter jurisdiction under Rule 12(b)(1). Motions to dismiss for lack of jurisdiction under Rule 12(b)(1) can generally take two forms: a facial attack or a factual attack. Relevant here, "[a] facial attack assumes the allegations in the complaint are true and argues they fail to establish jurisdiction." *Baker v. USD 229 Blue Valley*, 979 F.3d 866, 872 (10th Cir. 2020). But that assumption does not extend to conclusory allegations, unwarranted inferences, or legal conclusions. *Turner v. United States*, 501 F. App'x 840, 842 (10th Cir. 2012).

## III.      ANALYSIS

### A.      State Defendants' Motion to Dismiss

State Defendants move to dismiss on several grounds, including that they are immune from Audubon's suit under the Eleventh Amendment. "The Eleventh Amendment generally bars suits against a state in federal court commenced by citizens of that state or citizens of another state." *Elephant Butte Irrigation Dist. of New Mexico v. Dep't of Interior*, 160 F.3d 602, 607 (10th Cir.

1998). This immunity is premised on the traditional notion that a state cannot be sued without its consent. *Id.* There are three exceptions: (1) where a state has consented to be sued; (2) where Congress has abrogated a state's immunity; and (3) the *Ex parte Young* doctrine, which permits suits against state officials in federal court that seek only prospective equitable relief for violations of federal law. *Id.* at 607-08. The first two exceptions are not at issue here.

In determining whether the *Ex parte Young* exception applies, courts consider four factors: (1) whether the action is against state officials or the state itself; (2) whether the alleged conduct constitutes a violation of federal law as opposed to tortious interference with a plaintiff's property right; (3) whether the plaintiff seeks prospective relief or relief that is more analogous to a retroactive damage award impacting a state treasury; and (4) whether the suit implicates special sovereignty interest. *Id.* at 609.

Here, the Court focuses on the second element—whether the alleged conduct of State Defendants constitutes a violation of federal law—because it is dispositive of the analysis. This does not require a determination of whether state officials actually violated federal law. *Id.* at 610. Rather, the Court must only determine whether Audubon "state[s] a non-frivolous, substantial claim for relief against the state officials that does not merely allege a violation of federal law solely for the purpose of obtaining jurisdiction." *Id.* (internal quotation and citation omitted).

As a preliminary matter, the Court has carefully reviewed the complaint. As noted above, little has been done to distinguish the claims asserted against Federal Defendants versus State Defendants. Most claims are collectively pleaded, and it is not easy to discern what specific conduct of any specific defendant is at issue. Nor is there any clear indication of how State Defendants violated federal law or what cause of action Audubon is asserting against State Defendants.

Audubon argues that its non-frivolous, substantial claim for relief against State Defendants is that they aided and abetted, *see* Doc. 37 at 9, or "facilitated," *see id.* at 14, the violations of various federal statutes, regulations, and doctrines regarding the Refuge's water rights. *Id.* at 8-15. This is the result of the "illegal agreement between the state and federal defendants" and "[t]hese alleged violations of federal law would not have been made possible but for the role of the Kansas Defendants in entering and implementing the 2020 MOA . . . ." *Id.* at 9; *see also id.* at 7 ("In this action, the Plaintiff alleges that the formation and implementation of the 2020 MOA between the state and federal defendants named in this action constitutes an ongoing violation of a variety of federal laws pertaining to the administration and protection of the [Refuge].").

The problem with this argument is that State Defendants are <u>not</u> parties to the 2020 MOA. The 2020 MOA, according to Audubon's complaint, was entered into by the District[6] and the Service only. *See* Doc. 18 at ¶ 146 ("On July 25, 2020 the Service and [the District] executed a Memorandum of Agreement . . . .").[7] Thus, to the extent Audubon contends that State Defendants violated federal law through the 2020 MOA, that allegation is not supported by the complaint, which makes clear that State Defendants were not even parties to that agreement.

---

[6]  The District is not a state agency or under the control of KDA or KDA-DWR. *See* Doc. 49 at 3; *see also* Doc. 18 at ¶¶ 56-60 (explaining that groundwater management districts are entities authorized by the Kansas Groundwater Management District Act). The complaint reflects that the District and KDA-DWR operate independently of one another. *See* Doc. 18 at ¶¶ 104-147. Audubon does not argue that State Defendants are liable for the 2020 MOA because the District is a party to the agreement.

[7]  The 2020 MOA is referenced and attached to the complaint and is therefore properly considered by the Court, regardless of whether the defendants seek dismissal for failure to state a claim or for lack of jurisdiction. *Cf. GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) ("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss."); *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000) ("In reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff."). That agreement is signed only by representatives of the Service and the District. *See* Doc. 18-15 (identifying the Service and the District as the only parties to the agreement).

This makes this case distinguishable from the two cases primarily relied on by Audubon. In *Elephant Butte*, the plaintiffs alleged that an agreement entered by state and federal officials violated federal law. 160 F.3d at 606, 610. Although the federal law at issue primarily imposed obligations on the federal government, the court noted that state action can nevertheless also violate federal law if it aids federal parties in the violation of federal law. *Id.* at 610-11. However, in that case, the state was a party to the agreement at issue and was "purportedly enjoying the benefits" of it. *Id.* at 611. By contrast, State Defendants are not parties to the 2020 MOA, and thus any claim that the agreement violates federal law is not "a non-frivolous, substantial claim," *id.* at 610, that <u>State Defendants</u> are violating federal law.

Likewise, Audubon's reliance on *High Country Citizens' Alliance v. Norton* is not helpful on this point, as that case did not even address Eleventh Amendment immunity or whether state parties were alleged to have violated federal law. 448 F.Supp.2d 1235, 1242-43 (D. Colo. 2006) (listing the plaintiff's arguments as challenging the <u>federal</u> defendants' actions). And as in *Elephant Butte*, whether the agreements entered by state and federal parties in *High County Citizens' Alliance* were contrary to federal law is simply not relevant to Audubon's claims because State Defendants are not parties to the 2020 MOA.

To the extent Audubon contends that the alleged violation of federal law is premised simply on State Defendants' <u>inaction</u> in administering the Refuge Water Right, this is also not supported by the complaint. As State Defendants point out, the Chief Engineer of KDA-DWR is required to initiate an investigation upon a complaint that a water right is impaired. *See* K.S.A. § 82a-717a(b)(2)(A). Audubon acknowledges that this occurred, and the Impairment Report was issued. *See* Doc. 18 at ¶¶ 100-101. But at that point, further action under state law is only required if there is a request to secure water. *See* K.A.R. § 5-4-1(d). The Service did make some requests initially.

But the most recent one was withdrawn, *see* Doc. 18 at ¶ 142, and the Service has opted to not make further requests to secure water owing to the 2020 MOA. Without a request to secure water, State Defendants have nothing to act on.[8] Thus, there is no current obligation of State Defendants to act under state law.[9]

In sum, Audubon has not pleaded a non-frivolous, substantial claim that State Defendants have violated federal law. Accordingly, Audubon has not demonstrated that the *Ex parte Young* exception to Eleventh Amendment immunity applies. State Defendants are therefore entitled to immunity on all claims asserted against them, and their motion to dismiss must be granted.[10]

**B.      Federal Defendants' Motion to Dismiss**

Federal Defendants separately move to dismiss and argue that each Count in Audubon's complaint, all of which are asserted against Federal Defendants, should be dismissed for various reasons.

**1.      Counts One, Three, and Four**

Federal Defendants make two arguments why Audubon's APA claims in Counts One and Four fail. First, they argue there is no final agency action as the APA defines that term. Second, to the extent these claims are premised on inaction, Federal Defendants argue there is no discrete, legally required action that has not been taken. Regarding Count Three, which purports to assert a

---

[8]   Audubon seems to acknowledge this, as it argues that the relief it seeks, in part, is an order that the 2020 MOA be withdrawn, that Federal Defendants be ordered to immediately file a request to secure water, and that State Defendants <u>then</u> be instructed to administer the water right in compliance with federal law. *See* Doc. 37 at 25.

[9]   Even to the extent Audubon contends State Defendants failed to adhere to their state-law duties, that cannot circumvent Eleventh Amendment immunity because *Ex parte Young* requires a violation of federal law, not state law. *See Elephant Butte*, 160 F.3d at 607-08.

[10]   Given that Audubon's claims against State Defendants are premised on conduct that is factually not supported by the allegations in the complaint, its claims against State Defendants would also be subject to dismissal under Rule 12(b)(6) for failure to state a claim for relief that is plausible on its face, even if State Defendants were not entitled to Eleventh Amendment immunity.

"violation" of the APA, Doc. 18 at 38, Federal Defendants argue that the APA does not create an independent cause of action.

Before proceeding to the analysis of these arguments, the Court notes some confusion about the nature of and basis for Audubon's claims. Specifically, Counts One through Four all reference the APA, NWRSIA, or NEPA in various combinations. And on each claim, it is unclear whether Audubon is challenging agency <u>action</u> or <u>inaction</u>, or both.

Audubon's response brief attempts to clarify. Doc. 38 at 15-16. In Count One, Audubon alleges that Federal Defendants failed to protect and failed to secure the Refuge Water Right as obligated by NWRSIA, which is agency <u>inaction</u> challenged under 5 U.S.C. § 706(1) of the APA, and entered an informal agreement in October 2019 and the 2020 MOA, which is agency <u>action</u> challenged under § 706(2). In Count Three, Audubon claims "Federal Defendants failed to act in accordance with NWRSIA, a § 706(1) [<u>inaction</u>] claim, and took affirmative actions that violated NWRSIA and NEPA, a § 706(2) [<u>action</u>] claim." In Count Four, Audubon claims Federal Defendants have failed to acquire additional water rights to satisfy NWRSIA's "historic conditions" standard and failed to assist in maintaining adequate water quality and quantity for the Refuge—an agency-<u>inaction</u> claim under § 706(1). Accordingly, in Counts One, Three, and Four, Audubon is asserting both that Federal Defendants <u>acted</u> contrary to the provisions of NWRSIA and NEPA, and <u>failed to act</u> in accordance with the provisions of NWRSIA.[11] Importantly, Audubon does not argue that NWRSIA or NEPA provide it a private cause of action. Rather, it

---

[11]  The parties address Count Two separately, and the Court does likewise below. Count Two asserts a NEPA claim. As NEPA does not provide a private cause of action, Audubon argues its NEPA claim is reviewable under the APA. Doc. 38 at 27-32. Thus, it appears that Counts One and Four are APA challenges under NWRSIA, Count Two is an APA challenge under NEPA, and Count Three is an APA challenge under both NWRSIA and NEPA. All counts seem to target the same conduct, so other than the distinctions between NWRSIA and NEPA and the scope of relief sought, it is unclear what the differences are among these four claims.

relies on the APA to assert these claims. Accordingly, the Court considers the standards for evaluating APA challenges.

Under § 702 of the APA, a party "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute" may bring an action against the United States alleging that an agency "acted or failed to act in an official capacity or under color of legal authority." 5 U.S.C. § 702. "Section 702 generally waives the sovereign immunity of the United States, its agencies, and officials in agency review actions seeking specific relief." *Wyoming v. United States*, 279 F.3d 1214, 1236 (10th Cir. 2002). But only "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. "Agency action" for purposes of the APA "includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); 5 U.S.C. § 701(b)(2).[12] The agency action must be final. *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 61-62 (2004) (citing 5 U.S.C. § 704). The plaintiff has the "burden of identifying specific federal conduct and explaining how it is 'final agency action' within the meaning of section 551(13)." *Colo. Farm Bureau Fed'n v. U.S. Forest Serv.*, 220 F.3d 1171, 1173 (10th Cir. 2000).

Challenges under the APA can target both agency <u>action</u> and agency <u>inaction</u>. Under 5 U.S.C. § 706(2), a party may petition a court to set aside final agency action that is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law."

---

[12] "Rule," "order," "license," "sanction," and "relief" are further defined in 5 U.S.C. § 551(4), (6), (8), (10), and (11), respectively.

Under U.S.C. § 701(1), a party may also seek to "compel agency action unlawfully withheld or unreasonably delayed." Not all failures to act are actionable under the APA. *Norton*, 542 U.S. at 61. A "failure to act" is constrained by the same definition of agency action under the APA. *Id.* at 62. In other words, a party must be seeking to compel action challengeable under the APA. But additionally, "the only agency action that can be compelled under the APA is action legally <u>required</u>." *Id.* at 63 (emphasis in original). This excludes "broad programmatic" types of challenges and is more typically limited to ministerial or non-discretionary actions. *Id.* at 64-65.

Accordingly, in evaluating Audubon's APA claims in Counts One, Three, and Four, the Court first considers whether Audubon has identified "final agency action" challengeable under the APA, and then to the extent Audubon asserts inaction claims under § 706(1), the Court will consider whether Audubon has identified a discrete, legally required action that the Service has failed to take.

### a.    "Final Agency Action"

As outlined above, Audubon asserts APA claims based on both action and inaction in Counts One and Three, and inaction in Count Four. Doc. 38 at 15-16. An initial hurdle for both types of claims is demonstrating that the action or inaction complained of meets the definition of "agency action" under the APA. *Norton*, 542 U.S. at 62 (explaining that "failure to act" refers to failure to take some agency action as that term is defined by the APA). The agency action must also be final. *Id.*

The action and inaction Audubon takes issue with is the "bargain" struck in October 2019 by Federal Defendants (referred to as the "2019 statements"), the 2020 MOA, and the failure of Federal Defendants to make further requests to secure water. On their face, none of these seem to fit the definition of "agency action" under the APA, meaning an "agency rule, order, license,

sanction, relief, or the equivalent or denial thereof." 5 U.S.C. § 551(13). At the very least, Audubon makes little effort to argue that they do meet this definition, which is its burden. *See Colo. Farm Bureau Fed'n*, 220 F.3d at 1173.

In determining whether agency action is of the sort reviewable under the APA, the Tenth Circuit has stated that courts consider whether the action at issue has a direct and immediate impact, whether it marks the consummation of the decision-making process, and whether it determines rights or obligations from which legal consequences flow. *Id.* at 1173-74; *see also Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (stating that action is final if it marks the consummation of a decision-making process and is one from which legal consequences will flow and by which rights and obligations are determined).

Audubon contends that the 2019 statements and the 2020 MOA are judicially reviewable final agency action because they "fix[] the legal relationships pertaining to [the Refuge Water Right] for at least two years" and impose obligations on the Service to not protect the Refuge Water Right for two years, which gives junior groundwater rights holders the ability to use water without liability. Doc. 38 at 24-25.[13] In other words, although the 2019 statements and 2020 MOA do not finally or permanently resolve the issues surrounding the Refuge Water Right, it is nevertheless effectively a final agency decision regarding the Refuge Water Right for 2020 and 2021.

The Court finds Audubon has not established that the 2019 statements and 2020 MOA represent a judicially reviewable final agency action. The complaint clearly asserts that the 2019

---

[13]   Audubon additionally claims the 2020 MOA is a "final agency action" because it reflects a delegation of certain duties by the Service to the District, which Audubon contends is contrary to the law and is therefore reviewable under § 706(2)(A). Doc. 38 at 26. But that provision only states that a court can set aside "agency action" that is not in accordance with the law. Whether the delegation in 2020 MOA is lawful does not inform on whether the 2020 MOA is "agency action" under the APA.

statements reflect only an intention by the Service to "work to find local, voluntary, collaborative and non-regulatory solutions, including augmentation, to address the water needs of the community and the wildlife purposes of the refuge before determining if more formal measures are necessary to ensure the refuge's water rights are secured." Doc. 18 at ¶ 143; *see also id* ¶ 140 (stating that a "bargain" was reached so that the Service would withdraw its request to secure water in exchange for the District and state officials "working together to find an adequate solution to the Refuge's water-shortage problem"). The 2020 MOA similarly reflects and agreement between the Service and the District where the District would conduct "certain preliminary activities" to address the water supply for the Refuge. *Id.* ¶ 146. The 2020 MOA, clearly states that it is the intent of the parties to initiate certain activities so that a "Subsequent Agreement" could be reached to address the impairment of the Refuge Water Right, that the 2020 MOA merely "serves as the basis for the Subsequent Agreement," and that the parties "desire to put the proper assurances in place . . . until the Subsequent Agreement is executed." Doc. 18-15 at 1.

It's difficult to discern from any of this that the 2019 statements or the 2020 MOA reflect the consummation of any decision-making or finally establish any legal consequences pertaining to the Refuge Water Right. By their very terms, as pleaded in the complaint, the 2019 statements and the 2020 MOA at best reflect the <u>initiation</u> of the decision-making process regarding the Refuge Water Right, not <u>consummation</u> of it. They are by their terms agreements to come to an agreement.

The Tenth Circuit has held that this type of "general agreement for state and federal agencies to work together in the future on specific projects . . . is not 'final agency action.'" *Colo. Farm Bureau Fed'n*, 220 F.3d at 1174; *see also Sierra Club v. U.S. Army Corps of Engineers*, 446 F.3d 808, 813 (8th Cir. 2006) (finding that Memorandum of Agreement that "merely identified

sites that might justify building levees on HMGP-acquired properties and prescribed an interagency protocol" for certain determinations was not a final agency action).

Nor does the Service's agreement in the 2020 MOA to not submit requests to secure water for 2020 and 2021 make it a final agency decision as to those years. The Service still holds the Refuge Water Right, and nothing about the 2020 MOA permanently impairs it. *Compare High Country Citizens' All.*, 448 F. Supp. 2d at 1249 (finding that agreements by federal agency were final agency actions because they "would result in a <u>permanent</u> limit on the use of river water for the canyon" (emphasis added)). By Audubon's logic, every day in an ongoing decision-making process would become a final agency action by omission. Audubon provides no support for such an interpretation of the APA's "final agency decision" standard.[14]

It's clear that Audubon passionately disagrees with the path chosen by the Service in this case to address the Refuge Water Right. But the APA does not provide private parties with general oversight of federal agency decision-making. Rather, it provides a limited waiver of sovereign immunity for parties aggrieved by certain final agency actions. At some point, agency action surrounding the Refuge Water Right may become final. But Audubon has failed to carry its burden in showing that such final agency action has occurred at this stage. Accordingly, it's APA claims must fail.

---

[14] The Court notes Audubon's reliance on *Defenders of Wildlife v. U.S. Fish and Wildlife Service*. There, the Service issued a letter that stated a large portion of a refuge was open to commercial fishing, which the plaintiffs contended was a shift from the Service's earlier positions and "conclusively and dramatically expanded" harvest activities. 2021 WL 1909917, at *5 (D.S.C. 2021). The defendant challenged whether the letter was "final agency action" under the APA. *Id.* at *8. The court rejected that argument, though without analysis, noting that while "the Service's arguments may be appropriate for consideration on the merits," at the motion to dismiss stage, the plaintiffs had pleaded sufficient factual matter to state a plausible claim. *Id.* The lack of analysis on this point offers little assistance here. Further, a letter opening a refuge to commercial fishing is distinct from the agreements to come to an agreement at issue in this case.

### b.       Legally Required, Non-Discretionary Action

Even if Audubon could identify a final agency action properly challengeable under the APA, to the extent Audubon seeks to challenge agency <u>inaction</u> under § 706(1), it would have to show that the action it seeks to compel under the APA "is action legally <u>required</u>." *Norton*, 542 U.S. at 63 (emphasis in original). "[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a <u>discrete</u> agency action that it is <u>required to take</u>." *Id.* at 64 (emphasis in original). "[B]road programmatic" types of challenges or challenges to discretionary matters cannot be compelled. *Id.* at 64-65.

As explained above, Audubon asserts agency-inaction claims in Counts One, Three, and Four on grounds that the Service failed to protect and failed to secure the Refuge Water Right as obligated by NWRSIA, and in Count Four that the Service failed to secure additional water rights for the Refuge in violation of NWRSIA.

As a preliminary matter, it is not clear exactly which provisions of NWRSIA Audubon relies on in arguing that Federal Defendants have failed to act. Audubon provides a lengthy history of NWRSIA and argues it was enacted for the purpose of providing binding and enforceable management criteria. But even if this is a correct reading of NWRSIA and its history, *see Wyoming*, 279 F.3d at 1239-40 (describing NWRSIA as having "broad language and general directives"), it does not establish what discrete, legally required action is at issue.

Audubon does refer to provisions in NWRSIA that require the Secretary of the Department of the Interior to "ensure" biological integrity, diversity, and environmental health, *see* 16 U.S.C. § 668dd(a)(4)(B), and to "acquire . . . water rights that are needed for refuge purposes," *id.* at § 668dd(a)(4)(G). Even to the extent Audubon contends that the Service is legally required to

"ensure" the environmental health of the Refuge or "acquire" sufficient water rights, [15] there are

no specific statutory mandates on how the Service is to accomplish these goals. As *Norton* stated,

where "the manner of its action is left to the agency's discretion, a court can compel the agency to

act, but has no power to specify what the action must be." 542 U.S. at 65. At most, Audubon's

arguments are the type of "broad programmatic" attacks that the Supreme Court in *Norton* found

were improper. *Id.* at 64. *Norton* specifically cautioned against "judicial entanglement in abstract

policy disagreements":

> If courts were empowered to enter general orders compelling
> compliance with broad statutory mandates, they would necessarily
> be empowered, as well, to determine whether compliance was
> achieved—which would mean that it would ultimately become the
> task of the supervising court, rather than the agency, to work out
> compliance with the broad statutory mandate, injecting the judge
> into day-to-day agency management.

*Id.* at 66-67; *see also Gescheidt v. Haaland*, 2021 WL 3291873, at *8 (N.D. Cal. 2021) (noting

that statutory direction to an agency to protect and preserve certain natural areas does not

specifically detail how such aims should be accomplished); *Sierra Club v. Block*, 622 F. Supp.

842, 864 (D. Colo. 1985) (finding no specific duty to claim reserved water rights under the

Wilderness Act sufficient to sustain a § 706(1) claim even though the statute did impose a general

duty to protect and preserve wilderness water resources).

Audubon attempts to distinguish *Norton* on grounds that NWRSIA imposes more specific

commands than the statute at issue in *Norton*. Doc. 38 at 18. But in doing so, Audubon points to

certain subsections in NWRSIA that have no obvious relevance here. *See id.* at 18-19 (discussing

statutory provisions that address use of a refuge and deadlines for promulgating regulations

---

[15]   The Court notes that the Service has acquired the Refuge Water Right. The issue is whether it is adequately
defending it.

establishing procedures for determining compatible uses). The fact that NWRSIA may compel <u>some</u> discrete or specific agency action does not mean that the action Audubon seeks to compel in this case is likewise discrete or specific.

Audubon also contends that "courts have recognized the clarity and specificity of NWRSIA's mandates." *Id.* at 19. But the cases cited are inapposite to the issue in this case. *Niobrara River Ranch, L.L.C. v. Huber* only held that NWRSIA didn't provide such absolute or unfettered discretion to the Service so as to preclude judicial review altogether under 5 U.S.C. § 701(a)(2)[16] of the APA, and the claim at issue there was an action claim asserted under § 706(2), not an inaction claim under § 706(1). 277 F. Supp. 2d 1020, 1035 (D. Neb. 2003). And *United States v. Kenner* was a criminal case that simply held certain unrelated environmental regulations were not void for vagueness. 2016 WL 6269643, at *3 (D. Neb. 2016). Neither addresses, let alone supports, Audubon's position that the action it seeks to compel is a discrete, specific, legally required action under NWRSIA.

Because Audubon hasn't identified any legally required action under NWRSIA that can be compelled under the APA, its APA claims based on agency inaction must fail. Thus, based on the above analysis, Counts One, Three, and Four must be dismissed.

### 2.      Count Two

In Count Two, Audubon alleges that the 2019 statements and 2020 MOA were major federal actions requiring compliance with NEPA. *See* Doc. 18 ¶¶ 161-67; Doc. 38 at 30-31. Federal Defendants argue that NEPA is not applicable because there has been no major federal action in

---

[16]   Section 701(a) states that the APA applies unless a statute precludes judicial review or where agency action is committed to agency discretion by law.

the form of an irretrievable commitment of resources as required by NEPA, nor has there been any final agency action under the APA. Doc. 28 at 18-21.

"NEPA does not provide for a private right of action" and therefore any relief must be sought under the APA. *Colo. Farm Bureau Fed'n*, 220 F.3d at 1173. Where there is no actionable agency action, there can be no claim that the agency action required analysis under NEPA. *Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 448 (10th Cir. 1996) ("Because the National Environmental Policy Act does not contain a private right of action . . . a plaintiff must rely on the Administrative Procedures Act as the basis for its action and, therefore, in addition to satisfying the constitutional standing requirements, a plaintiff must establish it is 'adversely affected or aggrieved . . . within the meaning of a relevant statute' by some final agency action."). Further, "[i]n the NEPA context, the 'final agency action' required by the APA must also be a 'major federal action' under NEPA." *Karst Envtl. Educ. & Prot., Inc. v. E.P.A.*, 475 F.3d 1291, 1295 (D.C. Cir. 2007). A key consideration on this point is whether there has been an "irretrievable commitment of resources." *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 718 (10th Cir. 2009); *see also High Country Citizens' All.*, 448 F. Supp. 2d at 1243 (explaining that "major federal action" includes adoption of formal plans, programs, or agency decisions allocating agency resources").

Here, the Court has found that the 2019 statements and 2020 MOA are not "final agency actions" challengeable under the APA. For similar reasons, the Court finds there has been no "major federal action" sufficient to implicate NEPA's requirements. As explained above, the 2019 statements and 2020 MOA are essentially just agreements to come to an agreement about the Refuge Water Right. They are not, as Audubon argues, concerted actions to implement a specific plan. *See* Doc. 38 at 28. Nor are they the type of "major federal action" contemplated by NEPA.

*See High Country Citizens' All.*, 448 F. Supp. 2d at 1244-45 (stating that although a permanent relinquishment of a water right is a major federal action, year-to-year enforcement decisions or "whether or not to place a call on senior water rights may be a discretionary matter best left to" federal agencies); *United States v. Glenn-Colusa Irrigation Dist.*, 788 F. Supp. 1126, 1135 (E.D. Cal. 1992) (rejecting construction of NEPA "in which any decision of a law enforcement agency—whether to go forward with an action or forbear from action—would require a NEPA analysis"). Accordingly, to the extent Audubon claims these actions violated NEPA, that claim fails. Count Two must be dismissed.

### 3.      Count Five

Count Five alleges improper disposal of a portion of the Refuge Water Right for every year there has been a failure to secure water for the Refuge, all without the approval of Congress. The Court notes that the complaint is silent as to what precise cause of action is asserted on this point, what legal basis Audubon has to sue the Service (or anyone) for this action, or what standing Audubon has to challenge the alleged wrongful disposition of federal property. Frustratingly, neither party addresses these issues in their briefs.

Instead, Federal Defendants argue that this claim fails because no property has been disposed of because the Service continues to hold the Refuge Water Right and the 2020 MOA is only an enforcement decision to not file a formal request to secure water for two years while a more permanent solution is reached. Doc. 28 at 22-23. In response, Audubon spends several pages explaining the nature of water rights. What it appears to be arguing, again, is that the Service has surrendered its priority under the Refuge Water Right for certain years even though the Refuge Water Right itself has not been surrendered. Doc. 38 at 32-36. In other words, the right itself has not been surrendered, but some of the water has.

Ultimately, Audubon bases this claim on the same alleged agency action as its other claims—the 2019 statements and the 2020 MOA. Audubon claims these agreements are improper because they dispose of federal property without the approval of Congress. As the Court is not aware—and the parties have not identified—how Audubon might be challenging this action other than through the APA, the Court will construe this claim as an APA claim. As explained above, however, the 2019 statements and 2020 MOA are not "final agency action" under the APA. Accordingly, Audubon's claim for wrongful disposal of federal property fails for the same reason its other APA claims fail. Count Five must therefore be dismissed.

### 4.  Declaratory Judgment

Finally, Audubon dedicates several pages at the conclusion of its response brief to discussing whether its claim for declaratory judgment is justiciable. Doc. 38 at 36-41. But where relief is sought in the form of a declaratory judgment, there still must be a viable legal claim asserted. *Wyoming*, 279 F.3d at 1225 ("Nor does the declaratory judgment statute . . . itself confer jurisdiction on a federal court where none otherwise exists."). Here, the Court has determined that Audubon states no viable claims for which declaratory relief can be entered.[17] Accordingly, the Court does not consider whether Audubon's claims for declaratory relief are justiciable.

---

[17] As explained above, the Court has found all counts should be dismissed. Federal Defendants move under both Rule 12(b)(1) and Rule 12(b)(6), though it is somewhat unclear which rule is relied on for each claim. Audubon has clarified that most if not all its claims are based on the APA, and the Court has found that there is no final agency action. The Tenth Circuit has found the "final agency action" requirement jurisdictional. *Cherry v. U.S. Dep't of Agric.*, 13 F. App'x 886, 890 (10th Cir. 2001) (holding "the finality of an agency action is jurisdictional"), and thus dismissal is proper under Rule 12(b)(1). But even to the extent the "final agency action" requirement is not jurisdictional, dismissal would still be proper for failure to state a claim under the same reasoning. *See Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 188-89 (D.C. Cir. 2006) ("Thus, although the absence of final agency action would not cost federal courts their jurisdiction, . . . it would cost Trudeau his APA cause of action."); *New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1190-91 (D.N.M. 2020) (highlighting Tenth Circuit case law and recognizing circuit split).

**IV.     CONCLUSION**

As discussed above, Audubon has not demonstrated that the *Ex parte Young* exception to Eleventh Amendment immunity exists, and therefore its claims against State Defendants are dismissed. Nor has Audubon identified any final agency action that would allow it to pursue claims against Federal Defendants under the APA, and those claims must also be dismissed.

THE COURT THEREFORE ORDERS that State Defendants Motion to Dismiss (Doc. 25) is GRANTED. All claims against State Defendants are DISMISSED WITHOUT PREJUDICE.

THE COURT FURTHER ORDERS that Federal Defendants Motion to Dismiss (Doc. 27) is GRANTED. All claims against Federal Defendants are DISMISSED WITHOUT PREJUDICE.

THE COURT FURTHER ORDERS that Audubon's Request for Oral Argument (Doc. 53) is DENIED.

IT IS SO ORDERED.

Dated: October 20, 2021                          /s/ *Holly L. Teeter*
                                                 HOLLY L. TEETER
                                                 UNITED STATES DISTRICT JUDGE