**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**May 15, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

_____

| | |
|---|---|
| AUDUBON OF KANSAS, INC., | |
|      Plaintiff - Appellant, | |
| v. | No. 21-3209 |
| UNITED STATES DEPARTMENT OF INTERIOR; DEBRA HAALAND, Secretary of United States Department of the Interior; UNITED STATES FISH AND WILDLIFE SERVICE; MARTHA WILLIAMS, Director of United States Fish and Wildlife Service,* | |
|      Defendants - Appellees, | |
| and | |
| KANSAS DEPARTMENT OF AGRICULTURE; KANSAS DEPARTMENT OF AGRICULTURE, DIVISION OF WATER RESOURCES; | |
|      Defendants. | |

-----------------------------

_____

     * Under Federal Rule of Appellate Procedure 43(c)(2), David Bernhardt is replaced by Debra Haaland as the Secretary of the United States Department of the Interior, and Aurelia Skipwith is replaced by Martha Williams as the Director of the United States Fish and Wildlife Service.

Case 2:21-cv-02025-HLT-JPO   Document 67   Filed 07/07/23   Page 2 of 40

Appellate Case: 21-3209   Document: 010110859700   Date Filed: 05/15/2023   Page: 2

BIG BEND GROUNDWATER
MANAGEMENT DISTRICT NO. 5,

   Amicus Curiae.

_____

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 2:21-CV-02025-HLT-JPO)**

_____

Burke W. Griggs of Griggs Land & Water, LLC, Lawrence, Kansas, for
Plaintiff-Appellant.

Arielle Mourrain Jeffries, Attorney, Environment & Natural Resources
Division, Department of Justice (Todd Kim, Assistant Attorney General, with
her on the brief), Washington, D.C., for Defendants-Appellees.

Lynn D. Preheim & Christina J. Hansen of Stinson LLP, Wichita, Kansas, filed
an amicus curiae brief on behalf of Defendants-Appellees, for Big Bend
Groundwater Management District No. 5.

_____

Before **BACHARACH**, **PHILLIPS**, and **EID**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

   Bureaucracy and groundwater have at least two things in common: they

trudge along at a slow, arduous pace, and they become harder to redirect over

time. Appellant Audubon of Kansas (Audubon) is frustrated with federal

bureaucracy for these reasons, and understandably so. The United States Fish

and Wildlife Service (the Service) has known for decades that junior water-

rights-holders are impairing its senior water right in Quivira Wildlife Refuge

(the Refuge), threatening the endangered species there. Despite years of study

2

and negotiation between the Service, state agencies, and Kansas water districts, the Refuge water right remains impaired.

Audubon filed this lawsuit seeking to force the Service to protect the Refuge water right. But in 2023—after oral argument in this appeal—the Service *did* act by requesting full administration of the Refuge water right, which was a remedy Audubon sought for its failure-to-act claim. For its claims of unlawful agency action, Audubon also sought to set aside an agreement between the Service and a water district. But new evidence convinces us that all material terms of this agreement have expired.

The Service argues that Audubon's claims are moot; Audubon counters that its claims aren't moot or that a mootness exception should apply. Both parties have moved to supplement the appendix on the issue of mootness, and we granted those motions. Because the Service's allegedly unlawful agreement has expired, we agree that Audubon's claim of unlawful agency action under 5 U.S.C. § 706(2) is now moot, and we dismiss it for lack of jurisdiction. As for Audubon's claim of agency inaction under § 706(1), we find that the mootness exception of "capable of repetition but evading review" applies. But though we have Article III jurisdiction to review Audubon's § 706(1) claim, we still lack statutory jurisdiction under the Administrative Procedure Act (APA). We thus affirm the district court's dismissal of this claim.

# BACKGROUND

## I.   Factual Background

### A.   The Service's Senior Water Right

Since its creation in 1955, the Refuge has earned regional, national, and global renown as an important natural resource. Its saline wetlands provide shelter for endangered birds, including the whooping crane, the piping plover, the interior least tern, and the bald eagle. The migratory birds that visit the Refuge need "flooded conditions at proper times during the year, particularly during spring and fall migration." App. vol. 1, at 123. To supply adequate water for these species, the Refuge largely "depend[s] on surface water from the Rattlesnake Creek." App. vol. 2, at 255. But the amount of surface water available is intricately linked to the availability of surrounding groundwater.

The Service holds a Kansas water right to protect the Refuge, which encompasses 7,000 acres of wetland habitat for migratory birds and endangered species. The Refuge water right is "senior in priority to about 95% of the water rights in the basin." App. vol. 1, at 63. As a senior rights-holder, the Service has priority to use over 14,000 acre-feet of surface water from Rattlesnake Creek every year. Junior rights-holders must rely on the remaining water.

Under Kansas law, the chief engineer of the Kansas Department of Agriculture Division of Water Resources (Water Division) enforces and administers water rights "in accordance with the rights of priority of appropriation." Kan. Stat. Ann. § 82a-706 (2022). A senior rights-holder who

suspects its water right is impaired can file a complaint, triggering the chief engineer's duty to investigate. § 82a-717a(b)(2). If a junior rights-holder pumps out of priority and impairs a senior water right, the chief engineer may suspend the junior water right and impose other penalties. § 82a-737. And upon finding that a senior water right is impaired, the chief engineer may issue an order "that limits, curtails, or prevents the diversion and use of water" by junior rights-holders. § 82a-717a(b)(2)(B). Kansas law affords the chief engineer some discretion in administering water rights because water quantities vary from year to year, and in some years the chief engineer cannot fully honor all water rights. But despite this discretion, the chief engineer must always honor "the rights of priority of appropriation" and administer senior water rights first. § 82a-706.

### B.    Impairment of the Refuge Water Right

Beginning in the 1980s, the Service expressed concerns to the Water Division and the Big Bend Groundwater Management District #5 (Big Bend) that junior rights-holders were pumping groundwater out of priority, preventing the Refuge from fully exercising its water right. The Service's complaints launched a decades-long dialogue between the Service, the Water Division, and Big Bend about how to protect the Refuge water right. Together they tried various solutions, including a partnership with local water users in 1994 and a twelve-year management plan beginning in 2000. But by 2012, these solutions had done little to alleviate the Service's main concern—that junior rights-

holders were depleting its senior water right to Rattlesnake Creek by pumping groundwater out of priority. In 2013, the Service requested that the Water Division investigate the impairment of the Refuge water right, citing water shortages in the late summer and declining stream flows that threatened the endangered species in the Refuge.

In 2016, the Water Division released an impairment report, finding that "the Refuge's water supply has been regularly and substantially impacted by junior groundwater pumping." App. vol. 1, at 60. Using computer-generated modeling, the Water Division concluded that junior rights-holders were pumping 30,000 to 60,000 acre-feet per year "that would have otherwise flowed through or past the Refuge." *Id.* at 69. Because groundwater moves slowly over time, the Water Division estimated that, even if all junior rights-holders immediately stopped pumping out of priority, it would take at least two years (possibly even decades) to restore the streamflow to the Refuge and Rattlesnake Creek. The Water Division identified only two solutions to the impairment: (1) reducing junior groundwater pumping in the long term or (2) augmenting Rattlesnake Creek's stream flow from external sources. Still, the Water Division emphasized that it would not act on its findings "without the written request of the Service to secure water." *Id.* at 57.

Big Bend responded to the impairment report by emphasizing that "water holder[s] should not expect to be able to fully exercise the right each and every year." *Id.* at 163. Because water-rights certificates "are based on the maximum

6

year of record," Big Bend claimed it was inappropriate for the Water Division to "allow[] the Service to determine its monthly water needs based on the assumption that it will fully exercise its water right every single year." *Id.* To alleviate the impairment, Big Bend advocated for augmentation, which would involve pumping groundwater from other sources into Rattlesnake Creek to satisfy the Service's water right. Kansas law explicitly allows augmentation as a solution for water-right impairment in the Rattlesnake Creek subbasin. § 82a-706b(a)(2).

In response to comments by Big Bend and others supporting augmentation as the primary remedy, the Service brought up concerns about "legal and technical challenges in using augmentation." App. vol. 1, at 200. Legally, the Service was concerned that its needs for water would exceed the statutory limits on augmentation. And practically, the Service was concerned that many of the augmentation proposals would still not support the Refuge's water needs and that some proposals could further degrade the water quality in the basin. The Service insisted that "solving an issue of over-pumping with further pumping is not a sustainable solution." *Id.*

The Service formally requested to secure its water right from the Water Division for 2017, 2018, and 2019. While the Service worked with Big Bend to solve the impairment, the Water Division refrained from "impos[ing] strict administration of water rights" to allow Big Bend "more time to develop and implement a locally-developed solution." App. vol. 2, at 382. During this

ongoing negotiation, the Water Division didn't administer junior groundwater rights despite the Service's requests in 2017 or 2018. But in 2018, the Water Division urged Big Bend to begin "formal action to address the impairment" and to submit a plan to combine water-use reductions and augmentation. App. vol. 2, at 382–83.

In 2019, the Water Division rejected Big Bend's proposed solution. Further, that year the Water Division prepared a plan to protect the Refuge water right in 2020 through 2022 by administering junior water rights. But the Service soon encountered political pressure not to enforce the Refuge water right.

In October 2019, the Service publicly committed to refrain from requesting its water right from the Water Division in 2020. The Service also withdrew its 2019 request for its water right. The Service promised to use 2020 to "continue to work to find local, voluntary, collaborative and non-regulatory solutions, including augmentation, to address the water needs of the community and the wildlife conservation purposes of the refuge before determining if more formal measures are necessary." *Id.* at 412.

### C.   The Memorandum of Agreement

In July 2020, the Service and Big Bend signed a Memorandum of Agreement (MOA) outlining a "local, voluntary, collaborative solution to resolve the Service's water impairment complaint." *Id.* at 413. The parties agreed that augmentation would "be the primary mechanism" to address the

impairment of the Refuge water right. *Id.* But they also left room for other solutions, such as programs to purchase water rights. They agreed to "initiate evaluation" of the proposed augmentation solution under the National Environmental Policy Act (NEPA). *Id.* Subject to further NEPA analysis, the parties "preliminarily agree[d]" that the groundwater in the area satisfied the water-quality needs of the Refuge. *Id.*

After NEPA review, the parties agreed that they would create a "Subsequent Agreement" with "additional details of the projects." *Id.* The MOA would "serve[] as the basis for the Subsequent Agreement," and the Subsequent Agreement would "specify all terms and obligations related to the planning, design and implementation of an augmentation wellfield and the development of the water rights purchase and movement programs." *Id.* The Service and Big Bend described the MOA as "put[ting] the proper assurances in place . . . until the Subsequent Agreement is executed." *Id.*

The MOA outlined both short-term and long-term projects. Short-term projects, including a work plan for an augmentation wellfield for Rattlesnake Creek, would be completed within the first five years of the agreement. Long-term projects, including a program to purchase water rights, would be completed beyond five years. The MOA also included a more detailed timeline for certain actions. Big Bend planned to apply for federal funding by August 2020, and it expected to hear back by November 2020. By May 2021, the Service and Big Bend planned to complete the Environmental Assessment. And

by August 2021, the parties anticipated a decision. During 2020 and 2021, the Service agreed "not to submit a request to secure water" under Kansas law to fulfill its senior water right. *Id.* at 416.

Throughout the long negotiation process between the Service, the Water Division, and Big Bend, Audubon kept a careful eye on proposed solutions to the impairment of the Refuge water right. In 2016, Audubon submitted comments in response to the Water Division's impairment report, emphasizing the Refuge's value to migratory birds. In 2017, Audubon warned the Water Division that an augmentation solution would violate federal law. Audubon also insisted that the Service undergo administrative review "of any proposed resolution of the Refuge's impairment" to comply with NEPA and the APA. *Id.* at 369. And in 2018, Audubon threatened to sue the Service and the Water Division if they didn't secure the Refuge water right.

Finally, in March 2021, Audubon sued the United States Department of the Interior, the Service,[1] and state defendants representing the Kansas Department of Agriculture and the Water Division, alleging violations of state and federal law for these agencies' failure to protect the Refuge water right.

---

[1] Because the Department of Interior encompasses the Service, and because Audubon challenges their actions collectively, going forward we refer to the federal defendants jointly as "the Service."

## II.    Procedural Background

Audubon sued the Service under the National Wildlife Refuge System Improvement Act (NWRSIA) and NEPA, relying on judicial review under the APA for both claims. Audubon alleged both a failure to act and unlawful actions under NWRSIA and unlawful actions under NEPA.[2] Audubon also sued state defendants for violating state water statutes and the Service for unlawfully disposing of federal property. In its prayer for relief, Audubon requested a declaratory judgment for the NWRSIA and NEPA violations and injunctive relief requiring the Service and state defendants to comply with NWRSIA by enforcing the Refuge water right. Audubon also sought a writ of mandamus requiring the Service to "request[] the full administration of all water rights in the Rattlesnake Creek sub-basin that have impaired and are impairing the Refuge Water Right." App. vol. 1, at 52. And Audubon sought a similar writ of mandamus against the chief engineer of the Water Division to "comply with [the Service's] request." *Id.*

The Service moved to dismiss under Federal Rule of Civil Procedure 12(b)(1) for failure to establish subject-matter jurisdiction and under Rule 12(b)(6) for failure to state claims on which relief could be granted. It argued

---

[2] Audubon's complaint didn't distinguish between its claims for agency action and inaction under the APA, NWRSIA, and NEPA. In its response to the Service's motion to dismiss, Audubon clarified that its NWRSIA claim challenged agency inaction under 5 U.S.C. § 706(1) and that both its NEPA and NWRSIA claims challenged the agency action of entering the MOA under § 706(2).

that Audubon had failed to allege agency action, much less final agency action, under the APA. It also argued that Audubon's failure-to-act claim must fail because it wasn't grounded in a discrete, legally required agency action reviewable under the APA. And it argued that Audubon had failed to identify a major federal action requiring NEPA review.

The district court granted the Service's motion to dismiss on all claims. *Audubon of Kan., Inc. v. U.S. Dep't of Interior*, 568 F. Supp. 3d 1167, 1184 (D. Kan. 2021).[3] The court explained that Audubon had "failed to carry its burden in showing that such final agency action has occurred at this stage," so its APA claims must fail. *Id.* at 1180–81. The court found that even if Audubon identified a final agency action, it had still failed to identify a "legally required, non-discretionary action" to challenge agency inaction under the APA. *Id.* at 1181–82. Similarly, the court found no "'major federal action' sufficient to implicate NEPA's requirements." *Id.* at 1183. So the court dismissed Audubon's NEPA and NWRSIA claims without prejudice, both of which depended on the APA for judicial review. *Id.* at 1184. Audubon timely appealed the dismissal of its claims against the Service.

---

[3] The state defendants also moved to dismiss on sovereign-immunity grounds, and the court granted their motion under the Eleventh Amendment. *Id.* at 1174–77. Audubon doesn't appeal its claims against the state defendants or its claim for unlawful disposition of federal property.

12

Audubon asserts jurisdiction under the APA, 5 U.S.C. § 706. The Service claims that we lack jurisdiction under the APA and that Audubon's claims are now moot.[4]

### III.   Factual Developments on Appeal Relevant to Mootness

Based on new facts that developed on appeal, both parties moved to supplement the appendix on the mootness issue, and we granted their motions.

After Audubon filed its notice of appeal, the Service wrote Big Bend in January 2022 and renewed its promise not to request its water right while Big Bend continued its NEPA review. Appellant's Suppl. App. at 3. As the Service put it, the MOA "culminated" in December 2021, eliminating any need for a renewed MOA, "which may distract resources from engaging in the NEPA process." *Id.* The Service stated that it would continue to collaborate with Big Bend to "determine short and long-term actions that remed[y] the Refuge's impairment and promote[] water conservation in the Rattlesnake Creek Basin." *Id.*

But in February 2023, the Service filed a request to secure water with the Water Division. In a letter to the Water Division on February 10, 2023, the Service explained that "no alternative exists" under Big Bend's NEPA review "that will provide complete remedy for the impairment of [the Service's] senior

---

[4] Big Bend submitted an amicus brief supporting the Service's arguments and pointing out that the NEPA review process Audubon seeks is already ongoing.

water right." Appellees' Suppl. App. at 5. Though the Service would continue to support the NEPA process, the Service stated that requesting its water right "is the only means left . . . to fully remedy our impairment." *Id.* at 6.

The Service acknowledged that augmentation could remain part of the remedy, and the Service promised to "remain engaged in the planning process to help assess the feasibility and impacts of the augmentation well field, which will determine the appropriate level of augmentation." *Id.* Like the 2022 letter, the Service's 2023 letter maintained that the MOA's "substantive terms . . . expired on December 31, 2021." *Id.* at 5.

## DISCUSSION

### I.   Are Audubon's claims now moot?

"We review questions of mootness de novo." *Rio Grande Silvery Minnow v. Bureau of Reclam.*, 601 F.3d 1096, 1109 (10th Cir. 2010) (citing *R.M. Inv. Co. v. U.S. Forest Serv.*, 511 F.3d 1103, 1107 (10th Cir. 2007)). If a case is moot, we lack subject-matter jurisdiction. *Id.* (citing *Unified Sch. Dist. No. 259 v. Disability Rts. Ctr. of Kan.*, 491 F.3d 1143, 1146–47 (10th Cir. 2007)).

### A.   The Parties' Mootness Arguments

In its response brief, the Service argues that Audubon's § 706(1) claim is moot because the dismissal of Audubon's claims against the state defendants, which Audubon doesn't appeal, makes Audubon's failure-to-act claim unredressable. And the Service argues that Audubon's § 706(2) claims are moot because the Service's promise in the MOA to refrain from securing its water

14

right—a promise on which Audubon heavily relies to ground its claims—has since expired. Audubon counters that its claims remain redressable and that even if the MOA has expired, a mootness exception should apply to its § 706(2) claims based on the MOA.

More recently, after providing us with the February 2023 letter, the Service argues that Audubon's claims are moot because "[n]ot only have the [MOA] and any perceived commitments in the 2022 letter to [Big Bend] . . . expired on their own terms, but the Service has also now filed a request to secure water for 2023—the relief requested by [Audubon]." Appellees' Mot. to Suppl. App. 2.

Audubon counters that the MOA has not expired, contending that the effort "to develop an augmentation wellfield—the central effort formalized by the MOA—is still in place" and that the MOA remains in force through 2028. Appellant's Resp. to Appellees' Mot. to Suppl. App. 2. Audubon also argues that the Service "mischaracterize[s] [its] desired relief," and that though administering water rights according to priority of appropriation is necessary relief, it isn't sufficient. *Id.* at 3–4. Audubon claims that the request to secure water "does nothing on its own," forecasting that the Service's request will secure at most "temporary" relief for the Refuge. *Id.* at 6. And Audubon maintains that even if the February 2023 letter would otherwise moot the case, a mootness exception still applies.

15

## B.     Our Mootness Doctrine

To satisfy Article III's case-or-controversy limitation, "a litigant must have suffered some actual injury that can be redressed by a favorable judicial decision." *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983) (citing *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 38 (1976)). Standing and mootness are related Article III doctrines that "keep federal courts within their constitutional bounds." *Brown v. Buhman*, 822 F.3d 1151, 1163 (10th Cir. 2016). "Standing concerns whether a plaintiff's action qualifies as a case or controversy when it is filed; mootness ensures it remains one at the time a court renders its decision." *Id.*[5] When a plaintiff's injury is no longer actual and redressable during litigation, a case becomes moot. *Rhodes v. Judiscak*, 676 F.3d 931, 933 (10th Cir. 2012) (quoting *Iron Arrow*, 464 U.S. at 70).[6]

---

[5] In its response brief, the Service seems to collapse mootness into a standing inquiry by relying on the Supreme Court's description of mootness as "the doctrine of standing set in a time frame." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) (citation omitted). But the Court has since clarified that this description of mootness is "not comprehensive" and that "there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness." *Friends of the Earth v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). Given this distinction, we focus on whether Audubon's injury remains redressable under mootness doctrine, not standing doctrine.

[6] We note that "[m]ootness can be constitutional or prudential." *EEOC v. CollegeAmerica Denver, Inc.*, 869 F.3d 1171, 1173 n.1 (10th Cir. 2017) (citing *Jordan v. Sosa*, 654 F.3d 1012, 1023 (10th Cir. 2011)). Like the parties, we address only constitutional mootness. *See id.*

The key question for mootness is "whether granting a present determination of the issues offered will have some effect in the real world." *Ind v. Colo. Dep't of Corrs.*, 801 F.3d 1209, 1213 (10th Cir. 2015) (quoting *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1311 (10th Cir. 2010)). Once it's "impossible for a court to grant effective relief, a live controversy ceases to exist, and the case becomes moot." *Id.* But a case isn't moot when the plaintiff retains "a concrete interest, however small, in the outcome." *Prison Legal News v. Fed. Bureau of Prisons*, 944 F.3d 868, 880 (10th Cir. 2019) (quoting *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307–08 (2012)). For a plaintiff to maintain a concrete interest in the case, a favorable decision by the court must have a "more-than-speculative chance" of affecting the parties' rights. *Rhodes*, 676 F.3d at 935 (quoting *Transwestern Pipeline v. FERC*, 897 F.2d 570, 575 (D.C. Cir. 1990)).

We evaluate mootness for each claim of relief sought. *Smith v. Beccera*, 44 F.4th 1238, 1247 (10th Cir. 2022) (quoting *Prison Legal News*, 944 F.3d at 880). A claim for injunctive relief "becomes moot when the 'plaintiff's continued susceptibility to injury' is no longer 'reasonably certain' or is based on 'speculation and conjecture.'" *Id.* (quoting *Jordan*, 654 F.3d at 1024). And a claim for declaratory relief becomes moot when "the relief would not affect 'the behavior of the defendant toward the plaintiff.'" *Id.* (quoting *Rio Grande*, 601 F.3d at 1110). The Service bears the burden of showing that Audubon's

claims for relief are moot. *Id.* (quoting *West Virginia v. EPA*, 142 S. Ct. 2587, 2607 (2022)).

For its failure-to-act claim under § 706(1), Audubon sought declaratory, injunctive, and mandamus relief to force the Service to request the full administration of its senior water right from the Water Division. As Audubon points out, it also sought other broader forms of declaratory and injunctive relief to remedy the Service's alleged failure to act, such as declarations about the viability of augmentation under NWRSIA and an injunction forcing the Service to take "all affirmative actions necessary" to restore and protect the Refuge water right. But on appeal, Audubon focuses on the Service's failure to request the Refuge water right as the basis for its § 706(1) claim. Opening Br. 44–47 ("[F]iling a request to secure water under Kansas law is the only means by which the Service can comply with its substantive duties to ensure the 'maintenance of adequate water quantity and water quality' for the Refuge."). For its § 706(2) claim, Audubon challenged only the MOA as final agency action and sought a judgment setting aside the MOA as unlawful.

## C.   Audubon's § 706(2) Claims of Unlawful Agency Action

If the MOA has expired, then Audubon's claims based on § 706(2) are moot because the MOA is the only final agency action Audubon challenges. *Cf. Burke v. Barnes*, 479 U.S. 361, 363–64 (1987) (holding that a claim was moot when the legislative bill that it challenged expired by its own terms after the court of appeals entered judgment). The MOA set deadlines for the parties to

18

act in 2020 and 2021, and the Service agreed in the MOA "not to submit a request to secure water . . . to address its impairment" only in 2020 and 2021. App. vol. 2, at 416–17. Looking only at the language of the MOA, it appears to remain in effect until the parties reach a "Subsequent Agreement." *Id.* at 413. And the MOA set long-term and short-term project deadlines, the earliest of which wouldn't occur until 2025. *Id.* at 413–15. But letters provided by both parties on the issue of mootness reveal that all material terms of the MOA have since expired and that the Service is no longer bound by it.

The Service's January 2022 statements to Big Bend, its February 2023 statements to the Water Division, and its decision to request its water rights in 2023 reveal that all material terms of the MOA have expired. The Service's promise not to secure its water right while Big Bend completes NEPA review of an augmentation wellfield—the MOA's central bargain—is no longer in effect. And the Service's agreement that "after examining relevant data and hydrologic modeling, the development and implementation of an augmentation wellfield . . . will be the primary mechanism in addressing the [Refuge water-right impairment]," *id.* at 413, has also lapsed. The February 2023 letter shows that given the findings in Big Bend's NEPA review, the Service no longer considers augmentation to be viable as the primary means to resolve the impairment. So the Service acted to address the impairment by requesting full administration of its water right in 2023.

19

A declaration setting aside the MOA as unlawful would not affect the Service's behavior because the material terms of the MOA have already expired. *See Smith*, 44 F.4th at 1247 (quoting *Rio Grande*, 601 F.3d at 1110). Likewise, deciding whether the MOA violated NEPA and NWRSIA through the APA would have no "effect in the real world." *Ind*, 801 F.3d at 1213 (quoting *Abdulhaseeb*, 600 F.3d at 1311). Because it is impossible for us to "grant effective relief" on Audubon's claims based on the MOA, Audubon's NEPA and NWRSIA claims of unlawful agency action under § 706(2) no longer involve a live controversy and are now moot. *Id.*

Audubon argues that the MOA hasn't expired and that, even if it has expired, a mootness exception should apply. The first exception Audubon argues—capable of repetition but evading review—applies when (1) the agency action is too short in duration "to be fully litigated prior to cessation or expiration," and (2) "there is a reasonable expectation" that the same plaintiff will "be subject to the same action again." *Kingdomware Tech., Inc. v. United States*, 579 U.S. 162, 170 (2016) (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)). We limit this exception to "exceptional situations." *Id.*

Given the Service's letters in January 2022 and February 2023, it is unreasonable to expect that the Service will again enter an agreement with Big Bend substantially identical to the MOA. In 2022, the Service told Big Bend it saw no need for a renewed MOA. And in 2023, the Service ended its bargain with Big Bend to withhold from requesting the Refuge water right while Big

Bend completes NEPA review. NEPA review is expected to conclude in 2023, and the Service has decided that an augmentation wellfield alone won't resolve the impairment of the Refuge water right. It's doubtful that the Service will renew the MOA or create a new agreement with Big Bend with the same terms. So Audubon's § 706(2) claim doesn't meet the second prong of the mootness exception for actions that are capable of repetition yet evade review.

For similar reasons, the second mootness exception Audubon identifies— voluntary cessation of illegal conduct—also doesn't apply to the MOA. A defendant bears a heavy burden to show mootness "when the defendant moots the case by voluntarily ceasing its offending conduct." *WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174, 1183 (10th Cir. 2012) (citing *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000)). But we have explained that the voluntary-cessation exception doesn't apply when "the allegedly wrongful behavior . . . is highly fact-and-context-specific, rather than conduct that is likely to 'recur' on similar facts and in the same context." *Unified Sch. Dist. No. 259*, 491 F.3d at 1150. Here, the MOA arose out of a highly fact-specific context: Big Bend's NEPA review of an augmentation wellfield and the Service's agreement to refrain from requesting its water rights while Big Bend completes NEPA review. Now that the Service has concluded that augmentation alone won't resolve the impairment of its water right, it is doubtful that an agreement like the MOA will recur under the same facts and in the same context. The voluntary-cessation exception doesn't apply.

21

We hold that Audubon's NEPA and NWRSIA claims relying on § 706(2) of the APA for jurisdiction are now moot.

**D.   Audubon's § 706(1) Claim of Agency Inaction**

On appeal, Audubon focused its § 706(1) failure-to-act claim on the relief it sought forcing the Service to request full administration of its water right from the Water Division. Recently, the Service filed a request to secure its water right. The parties make new mootness arguments about the Service's 2023 request that diverge from the arguments they make in their briefs.

As for the Service's 2023 request to secure its water right, we agree with Audubon that the Service's decision to refrain from requesting its water right is an action that is capable of repetition yet would evade our review. And as for the mootness arguments that the parties raise in their briefs, we also agree with Audubon that the dismissal of its claims against the state defendants doesn't render its § 706(1) claim moot. All in all, Audubon's § 706(1) claim isn't moot.

We begin by addressing the parties' most recent mootness arguments about the effect of the Service's 2023 request to secure its water right. We then address the parties' mootness arguments in their briefs.

**1.   The Effect of the Service's 2023 Request to Secure Its Water Right**

Because the Service requested administration of its water right in February 2023, a court order forcing the Service to do so would have no effect this calendar year. Given the short one-year period of requests to secure water,

we must consider whether Audubon's challenge to the Service's decisions to refrain from requesting its water right in 2020, 2021, and 2022 falls under the mootness exception of capable of repetition but evading review.

The annual nature of requests to secure water rights satisfies the first prong of this mootness exception. *Kingdomware Tech.*, 579 U.S. at 170 (explaining that a two-year period "is too short to complete judicial review" of a contract (citing *S. Pac. Terminal Co. v. ICC*, 219 U.S. 498, 514–16 (1911))). Requests to fulfill an impaired water right last only one year in Kansas, Kan. Admin. Regs. § 5-4-1(e)(3) (2023), and a one-year process "expires too quickly for [the parties] to fully litigate the matter," *Kansas ex rel. Kan. Dep't for Child. & Fams. v. SourceAmerica*, 874 F.3d 1226, 1238 (10th Cir. 2017).

We also find a "reasonable expectation" that the Service will decide not to request its water right in a later year. *Kingdomware Tech.*, 579 U.S. at 170 (quoting *Spencer*, 523 U.S. at 17). The Service recently refrained from requesting its water right for three years in a row, including one year in which it was no longer bound by the MOA. App. vol. 2, at 416; Appellant's Suppl. App. at 3. And Audubon alleges that the Service withdrew its request to secure water in 2019 in response to political pressures—right when the Water Division was poised to fully enforce the Refuge water right. Given this history, there is a reasonable expectation in coming years that the Service will either withdraw its request to secure its water right, refrain from requesting its water right, or do both. *Cf. Rex v. Owens ex rel. Oklahoma*, 585 F.2d 432, 435 (10th Cir. 1978)

23

(finding a reasonable expectation that the state would again commit the plaintiff to a hospital when he "ha[d] been committed to a state hospital or mental health facility in Oklahoma on at least four distinct and separate occasions for a condition which seems to have evaded control or cure"). The Service can't moot Audubon's § 706(1) claim of agency inaction by taking one temporary step to enforce its water right—a step it has either refrained from taking or rescinded for four of the past five years.

We distinguish our analysis of this mootness exception between the MOA, for which the exception doesn't apply, and the Service's decision not to request its water right, for which the exception does apply. The MOA was a lengthy negotiated agreement with specific terms and set deadlines that arose out of a particular factual context; it is unlikely that the Service and Big Bend would enter this same agreement again. By contrast, the Service makes an ongoing decision whether to request administration of its water right, independent of any agreement with Big Bend.

We hold that the Service's 2023 request to secure its water right doesn't moot Audubon's APA failure-to-act claim because Audubon's claim falls under the mootness exception of capable of repetition but evading review.

## 2. Mootness: Redressability

We also address the parties' alternative mootness arguments that they raise in their briefs. The Service argues in its response brief that Audubon's § 706(1) claim is moot because the dismissal of Audubon's claims against state

defendants was an intervening event that deprived Audubon of a redressable injury. For its failure-to-act claim, Audubon sought declaratory, injunctive, and mandamus relief, forcing the Service to request the full administration of its senior water right from the Water Division. Though the Service has already requested its water right in 2023, we have explained that the Service's action doesn't moot Audubon's § 706(1) claim. We will now address whether a court order forcing the Service to continue to request its water right beyond 2023 would redress Audubon's injury without the state defendants before us.

Kansas law provides the Water Division discretion about how to respond to a request for administration of water rights. *See* §§ 82a-706; 82a-717a. Given this discretion, the parties disagree about whether we can predict the Water Division's response to such a request by the Service. For Audubon's claim to remain justiciable, a court order forcing the Service to continue to request the full administration of its water right must "have some effect in the real world." *Ind*, 801 F.3d at 1213 (internal citation omitted).

The Service insists that the remedy for Audubon's failure-to-act claim depends on the discretion of the state defendants, who are no longer before the court. Audubon counters that the Water Division will have to comply with the court order it seeks because the Water Division must "aid in the distribution of . . . water" according to a decree by any court that determines the "rights for the use of waters of the state." § 82a-719. Neither party's argument holds up

completely when compared to statutory language.[7] But on balance, we agree with Audubon. The dismissal of Audubon's claims against state defendants doesn't moot its § 706(1) claim because the court order Audubon seeks would have two real-world effects: (1) forcing the Service to continue to request full administration of its water right and (2) holding the Water Division to its duty to protect the rights of priority appropriation.

Though the Water Division may exercise discretion in administering water rights, it still "ha[s] a legal obligation to secure water to senior users." App. vol. 2, at 383. Under Kansas law, the chief engineer of the Water Division "*shall* enforce and administer [Kansas] laws . . . pertaining to the beneficial use of water and *shall* control, conserve, regulate, allot and aid in the distribution of water resources . . . in accordance with the rights of priority of appropriation." Kan. Stat. Ann. § 82a-706 (emphases added). In the Rattlesnake Creek subbasin, the chief engineer can choose to combat unlawful diversion of water by allowing augmentation "if . . . available and offered voluntarily." § 82a-706b(a)(2). Still, the chief engineer must honor the law on priority water rights. § 82a-706. We read the statute to mean that if an augmentation remedy isn't available in the Rattlesnake Creek subbasin, the chief engineer must, as

---

[7] Audubon misreads § 82a-719, which by its plain language requires the Water Division to distribute water according to a court decree only when that decree adjudicates underlying water rights. The order Audubon seeks would not adjudicate underlying water rights, so this portion of the Kansas water statute is not the redressability panacea that Audubon claims.

needed to protect senior water rights from unlawful diversions, "[d]irect that the headgates, valves or other controlling works of any ditch, canal, conduit, pipe, well or structure be opened, closed, adjusted or regulated." § 82-706b(a)(1). A senior rights-holder triggers this process by filing a request to secure water.

The Water Division explained the balance between its discretionary and nondiscretionary powers in its December 2017 letter to Big Bend. In that letter, the Water Division warned Big Bend that, though the Water Division would "not impose strict administration of water rights on January 1, 2018 . . . [or] in the immediate future," Big Bend needed to work with the Service to solve the impairment of the Refuge water right. App. vol. 2, at 382–83. If Big Bend failed to do so, the Water Division cautioned that the Water Division "ha[s] a legal obligation to secure water to senior users" and that "[i]f a local solution to address impairment is not proposed early in 2018, other actions will need to be considered." *Id.* at 383. This letter reflects the Water Division's understanding that, without the MOA, the Water Division would have to act to protect the Service's water right upon the Service's request. And the Water Division's past actions support this understanding. Though the Water Division refrained from administering junior water rights in 2017 and 2018 in response to the Service's requests, by 2019 the Water Division had prepared a plan to administer junior rights in 2020 through 2022—a plan the Water Division was

27

poised to implement if not for the Service's decision to withdraw its request to secure its water right in 2019.

The Water Division enjoys limited discretion under Kansas law, but it always must protect senior water rights above junior rights. *See* § 82a-706 (explaining that the chief engineer must "control, conserve, regulate, allot, and aid in the distribution of the water resources of the state . . . in accordance with the rights of priority of appropriation"). A court order requiring the Service to request full administration of its water rights would trigger the Water Division's duty to secure senior water rights, creating much more than a "speculative chance" of affecting the parties' rights. *See Rhodes*, 676 F.3d at 935 (quoting *Transwestern Pipeline*, 897 F.2d at 575). For one, such an order would force the Service to continue to request that the Water Division fulfill the Refuge water right. Audubon still has a concrete interest in forcing the Service to continue to make this request, however small that interest may be. *Prison Legal News*, 944 F.3d at 880 (quoting *Ind*, 801 F.3d at 1213). And what's more, the court order Audubon seeks will likely result in enforcement of the Refuge water right because the Water Division must honor senior water rights first. § 82a-706; *see Ind*, 801 F.3d at 1213 (quoting *Abdulhaseeb*, 600 F.3d at 1311) (explaining that a case is moot when it becomes "impossible for a court to grant effective relief"). Effective relief for Audubon's failure-to-act claim through the court order Audubon seeks is more than possible—it's highly likely.

Audubon's claims for injunctive and mandamus relief remain redressable because it is likely, not merely speculative, that the relief it seeks would lead to enforcement of the Refuge water right. *See Smith*, 44 F.4th at 1247 (quoting *Jordan*, 654 F.3d at 1024). And Audubon's claim for declaratory relief remains redressable because a declaration would affect the Service's behavior by forcing the Service to continue to request its water right. *See id.* (quoting *Rio Grande*, 601 F.3d at 1110). After considering the parties' redressability arguments in the briefs, we conclude that the relief Audubon seeks under § 706(1) remains redressable even without the state defendants before the court.

\* \* \*

The Service's 2023 request to secure its water right doesn't moot Audubon's § 706(1) claim because Audubon's claim is capable of repetition but would evade review. Nor does the dismissal of Audubon's suit against the state defendants moot Audubon's § 706(1) claim. We hold that Audubon's § 706(1) claim isn't moot.

## II.   Is Audubon's § 706(1) claim justiciable under the APA?

Now that we have confirmed our Article III jurisdiction to consider Audubon's § 706(1) failure-to-act claim, we must decide whether we have statutory jurisdiction. NWRSIA doesn't create a private right of action, so Audubon must bring its failure-to-act claim under the APA. *Wyoming v. United States*, 279 F.3d 1214, 1236 (10th Cir. 2002).

A.    **Standard of Review**

We review de novo "the dismissal of a complaint on its face under Rule 12(b)(1) or 12(b)(6)," applying "the same standard as the district court." *Id.* at 1222. To survive a 12(b)(1) motion to dismiss, a plaintiff must demonstrate that the court has subject-matter jurisdiction. And to survive a 12(b)(6) motion to dismiss, a plaintiff must state a plausible claim for relief on the face of a well-pleaded complaint. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). A plaintiff must go beyond "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" and plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 55–56). A plaintiff's complaint must "nudge the claim across the line from conceivable or speculative to plausible." *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021) (citing *Brown v. Montoya*, 662 F.3d 1152, 1163 (10th Cir. 2011)).

When applying the *Twombly–Iqbal* standard, "we take [a] Plaintiff's well-pleaded facts as true, view them in the light most favorable to [the] Plaintiff[], and draw all reasonable inferences from the facts in favor of [the] Plaintiff[]." *Id.* (citing *Brown*, 662 F.3d at 1162). In considering a motion to dismiss, we may look to attached documents if they "are central to the plaintiff's claim and the parties do not dispute the documents' authenticity."

*Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (quoting *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007)).

**B.    Is Audubon's failure-to-act claim actionable under § 706(1)?**

In limited circumstances, the APA allows for judicial review of an agency's failure to act. Section 706(1) allows courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). To bring a failure-to-act claim, a plaintiff must identify a "failure to take an agency action" that is (1) discrete and (2) legally required. *Norton v. S. Utah Wilderness All.* (*SUWA*), 542 U.S. 55, 62–63 (2004).

Audubon's failure-to-act claim concerns "the Service's chronic neglect toward the Refuge Water Right." Opening Br. 42. For its claim, Audubon relies on NWRSIA, which creates a "National Wildlife Refuge System" and imposes duties on the Secretary of the Interior and the Service to preserve and maintain these wildlife refuges across the country. 16 U.S.C. § 668dd(a). Audubon points to two statutory provisions under NWRSIA and claims that they create discrete, legally required actions that the Service must take: (1) "assist[ing] in the maintenance of adequate water quantity and water quality to fulfill the mission of the System and the purposes of each refuge," § 668dd(a)(4)(F), and (2) "acquir[ing], under State law, water rights that are needed for refuge purposes," § 668dd(a)(4)(G).

Audubon contends that "filing a request to secure water under Kansas law is the only means by which the Service can comply with its substantive duties"

31

under NWRSIA. Opening Br. 45. In so arguing, Audubon focuses on the first substantive duty: "assist[ing] in the maintenance of adequate water quantity and water quality." § 668dd(a)(4)(F).[8]

Statutory schemes that instruct agencies to perform delicate balancing acts between competing policy goals rarely provide the kind of discrete, legally required action that can ground an APA failure-to-act claim. In *SUWA*, the Supreme Court considered whether the non-impairment mandate of the Federal Land Policy and Management Act (FLPMA) imposed a discrete, legally required action on the Bureau of Land Management (BLM) that was reviewable under § 706(1) of the APA. 542 U.S. at 57–72. Plaintiffs challenged BLM's allowance of off-road-vehicle use on federal lands by pointing to a provision of the FLPMA requiring that "the Secretary shall continue to manage such lands . . . in a manner so as not to impair the suitability of such areas for preservation as wilderness." *Id.* at 59 (quoting 43 U.S.C. § 1782(c)). The Court reasoned that although "Section 1782(c) is mandatory as to the object to be achieved, . . . it leaves BLM a great deal of discretion in deciding how to achieve it." *Id.* at 66. The statute required BLM to balance wilderness protection with other competing uses, including recreation. *Id.* at 58 (citing § 1702(c)).

---

[8] In its complaint, Audubon also requested injunctive relief forcing the Service "to obtain additional water rights" to protect the Refuge. App. vol. 1, at 52. But on appeal, Audubon focuses only on the Service's duty "to file a request to secure water" as the discrete, legally required action to ground its § 706(1) claim. Opening Br. 46–47.

The Court explained that the APA doesn't allow "pervasive oversight by federal courts over the manner and pace of agency compliance with . . . congressional directives." *Id.* at 67. Instead, the APA incorporated the "traditional practice" of writs of mandamus, which were "limited to enforcement of a specific, unequivocal command" and "precise, definite act[s] about which an official had no discretion whatever." *Id.* at 63 (cleaned up). Like writs of mandamus, the APA empowers courts to compel agency action but precludes courts from prescribing the particular action. *Id.* at 64 (citation omitted). The Court held that the FLPMA did not define a discrete, legally required action that the BLM failed to take, so it rejected plaintiffs' "broad programmatic attack." *Id.* at 64, 66.

Following the Supreme Court's lead in *SUWA*, we have held that a regulation didn't create a discrete, legally required action for judicial review under APA § 706(1) when the language of the regulation was "mandatory as to the ultimate objective" but "le[ft] entirely to the [agency] the decision of how best to achieve this objective." *Utah Native Plant Soc'y v. U.S. Forest Serv.*, 923 F.3d 860, 874 (10th Cir. 2019). The Forest Service regulation at issue included language such as "to the extent practicable" that granted the agency discretion. *Id.* Given the wide array of options available to the Forest Service to achieve its goals under the regulation, we found "no discernible rules under which we may direct the [agency] to act in exercising its enforcement powers." *Id.* at 875.

Much like the language of the statute in *SUWA* and the regulation in *Utah Native Plant Society*, the language of the NWRSIA provisions Audubon cites is only "mandatory as to the object to be achieved" while leaving the Service "a great deal of discretion in deciding how to achieve it." *SUWA*, 542 U.S. at 66. The Service must "assist in the maintenance of adequate water quantity and water quality to fulfill the mission of the system and the purposes of each refuge," 16 U.S.C. § 668dd(a)(4), but NWRSIA doesn't describe specific actions the Service must take to accomplish this goal. And as the Service points out, a neighboring provision in NWRSIA requires the Service to "ensure effective coordination, interaction, and cooperation with owners of land adjoining refuges and the fish and wildlife agency of the States in which the units of the System are located." § 668dd(a)(4)(E). In other words, like the statute at issue in *SUWA*, NWRSIA requires the Service to balance wildlife protection with the competing interests of landowners. *See SUWA*, 542 U.S. at 58 (citing 43 U.S.C. § 1702(c)).

Section 668dd(a)(4) imposes fourteen duties on the Service to balance competing priorities, including conservation, collaboration with state agencies, cooperation with landowners, and family-friendly recreation. All these duties begin with "shall," reflecting that they are mandatory—but no provision prescribes the action Audubon seeks to enforce. True, § 668dd(a)(4)(G) requires the Service to acquire water rights to protect wildlife refuges. But we

34

don't read this section to require the discrete, legally required action that Audubon seeks: full annual enforcement of the Refuge water right.

We can't read § 668dd(a)(4)(F) and (G) myopically and overlook the fact that the Service must balance fourteen competing interests in every decision it makes. *Cf. SUWA*, 542 U.S. at 58, 66 (finding that BLM had a statutory duty to balance wilderness protection with other uses and "a great deal of discretion in deciding how to achieve [those goals]"). Reading § 668dd(a)(4)(F) and (G) as creating a discrete, legally required duty to assert water rights every year would tie the Service's hands in addressing its twelve other statutory duties under NWRSIA, all of which are prefaced by mandatory language. We don't see a "specific, unequivocal command" like a writ of mandamus in § 668dd(a)(4)(F) or (G) that would require the Service to assert its water right every year without leaving room for agency discretion. *SUWA*, 542 U.S. at 63 (citation omitted). Instead, the duties are phrased as mandatory objectives to balance and consider competing interests, leaving the Service discretion about how to fulfill them. *See id.* at 66.

Reading § 668dd(a)(4)(E), (F), and (G) together, we reject Audubon's argument "that filing a request to secure water under Kansas law is the only means by which the Service can comply with its substantive duties" under

NWRSIA.[9] Opening Br. 45. The Water Division's impairment report emphasized that even with the strictest administration of junior water rights, it could take years to decades for the Refuge water right to be restored. Filing a request to secure water under Kansas law is one way that the Service can comply with its NWRSIA duties, but it isn't the only way. The solutions the Service identified in the now-expired MOA—augmentation and purchase programs for water rights—were also sensible ways for the Service to honor its competing obligations to effectively coordinate with state agencies and landowners, to maintain adequate water quantity and quality, and to acquire water rights to protect the Refuge. § 668dd(a)(4)(E), (F), (G).

Nothing in NWRSIA requires the Service to enforce its water right *every* year. An agency's discretionary decision to temporarily refrain from enforcing its water right is hardly the kind of defiant bureaucratic delay that § 706(1) was enacted to address. *Cf. Forest Guardians v. Babbitt*, 174 F.3d 1178, 1185–86 (10th Cir. 1999) (finding unreasonable delay under § 706(1) when an agency had still not issued a *mandatory* decision more than three years after the statutory deadline). During decades of negotiations with Big Bend and the

---

[9] The Service acquired the Refuge water right in 1957 and perfected it in 1996. We conclude only that § 668dd(a)(4)(F) and (G) don't prescribe the discrete, legally required action Audubon seeks here: annual enforcement of the Service's full water right. We don't express an opinion about whether the provisions in § 668dd(a)(4) may provide other discrete, legally required actions besides the one Audubon identifies.

Water Division, the Service has weighed "a complicated balancing of a number of factors which are peculiarly within its expertise." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). We hold that the Service's decision to temporarily refrain from enforcing its water right is unfit for judicial review under § 706(1) of the APA.[10]

## CONCLUSION

Audubon's NEPA and NWRSIA claims of unlawful agency action under 5 U.S.C. § 706(2) are now moot, so we dismiss them for lack of jurisdiction. Audubon's NWRSIA claim of agency inaction under § 706(1) isn't moot because it is capable of repetition yet would evade review. But we still can't review Audubon's failure-to-act claim under § 706(1) because Audubon fails to point to a discrete, legally required action in NWRSIA that the Service has failed to perform. We affirm the district court's dismissal of Audubon's § 706(1) claim.

---

[10] Audubon also seeks mandamus relief to compel the Service to request full administration of its water right. Section 706(1) of the APA incorporates the traditional requirements for mandamus relief—a discrete, legally required action that the agency has failed to perform—and those requirements aren't met. *See SUWA*, 542 U.S. at 62–63. "Mandamus is a drastic remedy, available only in extraordinary circumstances." *W. Shoshone Bus. Council ex rel. W. Shoshone Tribe of Duck Valley Rsrv. v. Babbitt*, 1 F.3d 1052, 1059 (10th Cir. 1993) (citing *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34–35 (1980)). When review by other means, such as under the APA, is possible, mandamus isn't available. *Id.* (citing *Kerr v. U.S. Dist. Ct.*, 426 U.S. 394 (1976)). Audubon tried and failed to establish a failure-to-act claim under § 706(1). It can't then turn to mandamus relief as an alternative. *Id.* We affirm the district court's denial of mandamus relief to Audubon.

No. 21-3209, *Audubon of Kansas v. United States Department of Interior*

**EID**, J., concurring in part and concurring in the judgment.

I agree with the majority that the claims under 5 U.S.C. § 706(2) regarding unlawful agency action are moot but disagree with its application of mootness doctrine to the agency inaction claims under 5 U.S.C. § 706(1). These claims are also moot because the relief sought by Audubon is a discretionary action by state defendants that are no longer parties to this litigation. Because at this point an order by a federal court in this case will have very little, if any, impact in the real world, the inaction claims are moot.[1] Accordingly, I concur in part and concur in the judgment.

"The crux of the mootness inquiry in an action for prospective relief is whether the court can afford meaningful relief that 'will have some effect in the real world.'" *Rezaq v. Nalley*, 677 F.3d 1001, 1008 (10th Cir. 2012) (cleaned up) (quoting *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1110 (10th Cir. 2010)). Here, Audubon asks us to tell the federal government to ask the state government to do something that it has asked the state to do before without success. The state defendants are no longer parties to this suit; consequently, we cannot tell them directly to act, even if we wanted to do so. Mootness deals with the practical realities of the real world, not a minute theoretical possibility under state law that something could come to fruition if we ordered someone to ask for it.

---

[1] Because I would find the inaction claims to be moot, I would not reach the question whether there is final agency action under the Administrative Procedure Act. *See* maj. op. at 29–37.

The majority wrongly concludes otherwise.  It correctly notes that "[t]he Service formally requested to secure its water right from the Water Division for [the years] 2017, 2018, and 2019."  Maj. op. at 7.  But the problem was not resolved.  Indeed, the majority recognizes that the Water Division has "discretion in administering water rights."  *Id.* at 26.  Even the provisions that the majority treats as mandatory aspects of Kansas law have discretionary components.  For example, the processes that the Water Division's chief engineer must direct if augmentation is not available shall be done "*as may be necessary* to secure water to the person having the prior right to its use."  Kan. Stat. Ann. § 82a-706b(a) (emphasis added).  Thus, even this component involves discretion in determining necessity.  And we may not direct that discretion—especially where Kansas governmental parties are no longer party to this case.  Thus, the majority's argued-for real-world effects—"(1) forcing the Service to continue to request full administration of its water right and (2) holding the Water Division to its duty to protect the rights of priority appropriation," maj. op. at 26—are illusory.

The majority suggests that "Audubon's claims for injunctive and mandamus relief remain redressable because it is likely, not merely speculative, that the relief it seeks would lead to enforcement of the Refuge water right."  *Id.* at 29 (citing *Smith v. Becerra*, 44 F.4th 1238, 1247 (10th Cir. 2022)).  As noted above, however, the majority would have this court order the Service to request that Kansas exercise its discretion to enforce a water right.  This proposed chain of events is the very definition of speculative relief.  The majority also suggests that "Audubon's claim for declaratory relief remains redressable because a declaration would affect the Service's behavior by forcing the

2

Service to continue to request its water right." *Id.* (citing *Smith*, 44 F.4th at 1247).  But again, such an impact on the Service's behavior would have very little impact on whether the right is actually enforced.  Moreover, as the Service argued, "[t]he possibility of declaratory relief alone is insufficient to meet the requirements of Article III."  Aple. Br. at 46 n.9 (citing *Cox v. Phelps Dodge Corp.*, 43 F.3d 1345, 1348 (10th Cir. 1994)).  In the end, the agency inaction claims portion of the majority's opinion is nothing more than an unconstitutional advisory opinion.[2]  Accordingly, I concur in part and concur in the judgment.

---

[2] Importantly, the majority's position that the capable of repetition yet evading review exception to mootness saves the § 706(1) claims from being moot does not impact this redressability point—which is separate from the majority's other analysis. *Compare* maj. op. at 22–24 (capable of repetition yet evading review), *with id.* at 24–29 (redressability). These claims are still moot due to the absence of the former state defendants even if the conduct underlying the agency inaction claims is capable of repetition yet evading review.

3